610 F.2d 70
 60 A.L.R.Fed. 390, 7 O.S.H. Cas.(BNA) 1820,
1979 O.S.H.D. (CCH) P 23,987
 LEAD INDUSTRIES ASSOCIATION, INC., Plaintiff-Appellant-Cross-Appellee,
v.
OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION et al.,
Defendants-Appellees-Cross-Appellants.
 Nos. 220, 291, Dockets 79-6141, 79-6146.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 10, 1979.
Decided Oct. 18, 1979.
 
 James A. Reaves, New York City (Debevoise, Plimpton, Lyons & Gates, New York City, Standish F. Medina, Jr., Nicole A. Gordon, New York City, of counsel), for plaintiff-appellant-cross-appellee, Lead Industries Ass'n, Inc.
 David M. Jones, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Michael H. Dolinger, Asst. U. S. Atty., New York City, of counsel), for defendants-appellees-cross-appellants, Occupational Safety and Health Administration et al.
 Before LUMBARD, FRIENDLY and GURFEIN, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This appeal and cross-appeal from orders of Judge Sweet in the District Court for the Southern District of New York require us to pass upon the application of the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and particularly exemption (b)(5), in a case where plaintiff's avowed objective in seeking agency records is to utilize them in prosecuting a petition in another circuit to review a rule promulgated by the agency. Plaintiff, Lead Industries Association, Inc. (LIA or the Association), objects to the court's refusal to direct the Occupational Safety and Health Administration (OSHA) to produce (except for certain segments) two draft reports prepared after the rulemaking hearing by outside consultants who had testified at the hearing;[1] the defendants appeal from the court's requiring production of several hundred excerpts from those two reports and numerous other documents.
 
 I.
 
 2
 An understanding of the issues on appeal requires some background:
 
 
 3
 It has long been known that absorption of lead (Pb) by workers exposed to it involves health hazards. The then Secretary of Labor published in the Federal Register of October 3, 1975, 40 F.R. 45934, pursuant to §§ 6(b) and 8(c) of the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 655(b) and 657(c), notice of a proposal to promulgate a new occupational safety and health standard for exposure to lead.[2] The notice requested submission of written comments, data and arguments from interested parties, stated that an informal hearing might be requested, and said that after the hearing (if one was held) OSHA would issue "a final standard based on the full record of the evidence." It also explained that:
 
 
 4
 The proposed standard reduced the permissible employee exposure limit to an 8-hour time-weighted average concentration, based on a 40-hour workweek of 100 micrograms of lead per cubic meter of air (100 ug/m 3).
 
 It described as one of the major issues:
 
 5
 Whether the proposed permissible exposure limit to lead should be 100 ug/m 3 ; and whether this level incorporates an appropriate margin of safety.[3]
 
 
 6
 A hearing began in Washington on March 15, 1977 and lasted seven weeks; shorter hearings were held in April in St. Louis and in May in San Francisco. Further hearings were held for several days in November and one in December. Final certification of the hearing record of some 40,000 pages was completed on August 8, 1978, see 43 F.R. 52953 (1978).
 
 
 7
 On November 14, 1978, the Assistant Secretary of Labor for Occupational Safety and Health published the final standard, to be effective February 1, 1979, 43 F.R. 52952, 53007-14. This limited occupational exposure to lead to 50 ug/m 3, the agency stating that:
 
 
 8
 The basis for this action is evidence that exposure to lead must be maintained below this level to prevent material impairment of health or functional capacity to exposed employees.
 
 
 9
 The new standards were preceded by a preamble of 55 pages which sought to explain Inter alia why, on the basis of the record, the more stringent standard was required and was feasible. A week later the Department of Labor published, 43 F.R. 54354, some 155 pages of attachments to the preamble dealing with both medical and economic aspects of the standard, allegedly on the basis of record materials. The preamble and attachments were published pursuant to a statutory requirement that the Secretary provide a statement of reasons whenever promulgating a new standard or substantially changing an existing consensus standard. 29 U.S.C. § 655(b)(8), (e).
 
 II.
 
 10
 Literally in a matter of seconds after the filing of the standard, petitions for review were filed in the Fifth Circuit by LIA and in the Third Circuit by the United Steelworkers of America. The actions were eventually transferred to the Court of Appeals for the District of Columbia,[4] where they were consolidated with a number of other petitions under the name of United Steelworkers of America v. Ray Marshall, et al., Docket No. 79-1048. LIA and members of the industry attacked the standard on the grounds, Inter alia, that the record, which admittedly had been primarily concerned with the need for and feasibility of a 100 ug/m 3 standard, see 43 F.R. 52977, did not contain substantial evidence to support the stiffer 50 ug/m 3 requirements, and that the proceedings had been contaminated by impermissible contacts between the Secretary of Labor who promulgated the regulation and agency staff and outside consultants who had presented controversial views during the rulemaking proceeding. See Hercules Inc. v. EPA, 194 U.S.App.D.C. 172, 200-04, 598 F.2d 91, 119-23, 127 (D.C.Cir.1978).
 
 
 11
 On November 17, 1978, counsel for LIA submitted to Grover C. Wrenn, Director of OSHA's Health Standards Program, a written request under FOIA that he furnish or make available for inspection and copying five categories of documents.[5] The request went on to say:
 
 
 12
 If any part of the documents requested above discloses inter-agency or intra-agency communications which reflect deliberative or policy-making processes (rather than factual or investigatory reports) and which, in your opinion, fall within the exclusion specified in 5 U.S.C. § 552(b)(5), we request that the excluded matters be identified and that the remainder of the document or documents be produced as required by 5 U.S.C. § 552(c).
 
 Candidly stating that:
 
 13
 The documents specified above are being sought for use in connection with the judicial review of the final lead standard,
 
 
 14
 the letter asked that the requested documents be furnished "as promptly as possible to avoid the necessity for formal court action."
 
 
 15
 Mr. Wrenn responded on December 22, 1978. OSHA released five items (or categories of items) unnecessary to describe. OSHA's letter listed nine items (or categories of items) which it described as containing "opinions, recommendations and evaluations intended to influence OSHA's decisions, regarding the development of the final lead standard" and thus exempt under 5 U.S.C. § 552(b)(5).[6] It also listed four categories not here at issue, which were alleged to be protected by the attorney-client privilege and therefore also exempted by § 552(b)(5).
 
 
 16
 LIA promptly took an administrative appeal to the Solicitor of Labor, 29 C.F.R. § 70.50. On January 26, 1979, when a determination of the appeal was due under FOIA, 5 U.S.C. § 552(a)(6)(A)(ii), LIA was notified that the processing of its appeal was not yet completed due to the voluminous record. Further documents or portions of documents were eventually released pursuant to this administrative appeal on April 18, 1979.
 
 
 17
 Simultaneously with its FOIA request to OSHA, LIA filed a request with CWPS for documents described in the margin.[7] This letter contained the same qualifications and statements of purpose as the letter to OSHA. On January 26, 1979, CWPS' General Counsel partially denied the request on the basis of 5 U.S.C. § 552(b)(5).
 
 
 18
 Without awaiting decision of its OSHA appeal or attempting an administrative appeal to the Director of CWPS, 6 C.F.R. § 702.12, LIA brought this action against both agencies in the District Court for the Southern District of New York on January 31, 1979. Three days later it moved for an order requiring the defendants to prepare what has come to be known as a "Vaughn v. Rosen " index, see Vaughn v. Rosen, 157 U.S.App.D.C. 340, 346-48, 484 F.2d 820, 826-28 (D.C.Cir.1973), Cert. denied, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), of the withheld documents. CWPS moved for dismissal of LIA's complaint as to it for failure to exhaust administrative remedies. On March 16, 1979, Judge Sweet filed an opinion directing OSHA to prepare the index but dismissing the complaint against CWPS and its officers for failure to exhaust administrative remedies.[8]
 
 
 19
 Activity then shifted back to the Court of Appeals for the District of Columbia Circuit. American Smelting & Refining Company (ASARCO), an important producer of lead and a petitioner for review of the new standards, moved on March 28, 1979, to supplement the record and for discovery. Supplementation was sought with respect to certain exhibits attached to an affidavit of counsel for LIA in this action which described its progress. The attached exhibits included a transcript of a controversial speech delivered by Assistant Secretary of Labor for Occupational Safety and Health and Director of OSHA Eula Bingham to a meeting of the United Steelworkers Union (exhibit 1) and a transcript of the press conference at which the final standard was announced (exhibit 91); certain documents filed in connection with this FOIA litigation, including the LIA request of November 17 (exhibit 2); the Wrenn response of December 22 (exhibit 3), and Judge Sweet's Opinion of March 16 (exhibit 3a);[9] and those documents, or portions of them, voluntarily furnished LIA by OSHA in its response of December 22 (exhibits 4-90).[10] The documents sought for inspection and copying were described in a proposed order as follows:
 
 
 20
 1. all documents which embody, refer to, or relate to instructions, suggestions, or other guidance given to any person performing functions with respect to the rulemaking,
 
 
 21
 2. all documents which embody, refer to, or relate to any communications between a decisional participant and any other person with regard to the rulemaking, and
 
 
 22
 3. all documents concerning the rulemaking brought to the attention of Assistant Secretary Bingham or any other decisional participant.
 
 
 23
 ASARCO suggested that if the court were not disposed to order discovery, ASARCO should be permitted to commence in the District Court for the District of Columbia "an action in the nature of a bill of discovery in aid of" the proceeding in the Court of Appeals. By order dated May 8, 1979, the Court of Appeals "lodged" most of the exhibits attached to counsel's affidavit pending determination whether they were to be included in the record, an issue the parties were directed to address in their briefs. Discovery was denied, without a statement of the reason.
 
 
 24
 While this had been going on in the District of Columbia Circuit, Judge Sweet, in an opinion dated April 27, 1979, denied the motions of both parties for summary judgment, without prejudice to renewal, on the basis that the Court of Appeals for the District of Columbia was "best qualified to determine whether or not the plaintiff here is entitled to the documents." When that court denied discovery, Judge Sweet, after first ordering on June 4 that the documents be submitted for In camera review, rendered a memorandum opinion and order on June 14. He stated the governing principles to be that "documents found to be in whole or in part internal communications consisting of advice, recommendations, opinions and other material reflecting deliberative or policy making processes and not purely factual or investigatory reports fall within the (b)(5) exemption" but that "(f)actual material or facts contained in a deliberative or policy memo which are severable from it . . . or which have been publicly cited by OSHA as a basis for its action" were to be disclosed. Thirteen documents not involved in this appeal were ruled to be exempt in their entirety. Other documents were likewise held to be exempt in overwhelming part. However, the court ordered disclosure of roughly 390 excepts "to the extent the information has not been disclosed." The court offered the Government the option of turning over the raw factual data supporting the segments rather than the segments themselves.
 
 
 25
 The Government then renewed its motion for summary judgment on the basis that LIA had not controverted the Government's assertion in its statements under Rule 9(g) of the District Court that the factual material in the designated segments was in fact in the public record a claim supported by further affidavits.[11] In a further opinion the judge, after reaffirming his previous position, said:
 
 
 26
 While the defendants may validly claim that the entire list of information which was ordered to be produced is exempt from disclosure because it is a part of the public record, absent such a demonstration, the documents previously described must be produced. To date, no such demonstration has been made.
 
 
 27
 Defendants were ordered to comply within five days.
 
 
 28
 The Government applied to Judge Sand, who was acting as the Emergency Judge, for a stay to enable it to make the demonstration to which Judge Sweet had referred. It introduced an affidavit of the Associate Solicitor for Occupational Safety and Health in the Department of Labor, describing how the government was preparing to make this demonstration with respect to the 390 segments by cross-indexing the facts contained in them against the 40,000 page rulemaking record. He affirmed that this monumental task could not be performed within 5 days, as seems obvious, but estimated it could be done within 30. Having been presented with an affidavit from counsel for LIA that its "need for these documents is critical" since argument in the D.C. Circuit on the petition for review was scheduled for the fall, and believing that Judge Sweet's allowing only a five-day period reflected acceptance of this position, Judge Sand denied the stay. Although the Government appealed from this denial and moved in this court for a stay, this was rendered moot by an agreement of the parties to maintain the Status quo pending appeal from Judge Sweet's orders.
 
 III.
 
 29
 We begin our discussion by rejecting the Government's suggestion that LIA is precluded from prevailing in this action by the refusal of the Court of Appeals of the District of Columbia Circuit to order discovery in the review proceeding there pending. It is true that ASARCO's use of an affidavit by LIA's counsel detailing the proceedings in the district court and other circumstances might suffice to show privity between LIA and ASARCO or that, apart from privity, estoppel might be appropriate under the principle of Blonder-Tongue Laboratories Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), if all its conditions were satisfied. However, it is not completely clear that the issues on ASARCO's motion in the District of Columbia Circuit and in this action are the same. ASARCO's request was based on an asserted right of a petitioner for review of an OSHA standard under 29 U.S.C. § 655(f) to have available not only the rulemaking record but extra- record material on which the agency may have relied, apparently as a matter of administrative common law; LIA's case is based on FOIA. It is true that the statutory test under § 552(b)(5) is whether the materials would be available "to a party other than an agency in litigation with the agency." It is not at all clear, however, that the Court of Appeals for the District of Columbia approached ASARCO's motion as a routine discovery matter, which courts have held to be the import of the quoted language. See H.R.Rep. No. 1497, 89th Cong., 2d Sess. (1966), U.S.Code Cong. & Admin.News 1966, p. 2418, FOIA Source Book, 93d Cong., 2d Sess. 31 (1974); NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); Sterling Drug Inc. v. FTC, 450 F.2d 698, 704-05, 146 U.S.App.D.C. 237, 243-44, (D.C.Cir.1971). One of the issues on ASARCO's motion was whether an Appellate court could or should order the discovery sought. ASARCO argued that such power existed either under F.R.A.P. 16(b)[12] or as an "inherent" matter. F.R.A.P. 16(b), however, nowhere speaks of discovery but merely of correction of omissions or misstatements in the record, see 9 Moore, Federal Practice P 216.03 n. 2 (1975), and is better support for supplementation of the record than for extensive discovery, as ASARCO itself recognized. ASARCO conceded that an appellate court's power to order discovery was "ill-defined and uncertain" and that it had "been only sparingly used". The strongest authority in favor of such a power in an administrative review proceeding is a statement by the writer in National Nutritional Foods Ass'n v. FDA, 491 F.2d 1141, 1144 (2 Cir.), Cert. denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974). However, this was narrowly phrased and in fact discovery was denied. Recognizing the dubiety of its position, ASARCO alternatively sought leave to commence in the District Court for the District of Columbia "an action in the nature of a bill of discovery in aid of" the Court of Appeals proceeding. In light of all this, and because the Court of Appeals for the District of Columbia did not disclose its reasons for denying discovery, we cannot be sure that court fully considered the merits of ASARCO's request; it may have doubted the power of an appellate court to order discovery or have felt that even, if power exists, it should be most sparingly exercised. The district judge acted quite reasonably in holding the FOIA action in abeyance pending the determination of ASARCO's motion but, for the reasons stated, we cannot agree with him that "the right to disclosure in the (District of Columbia) Court of Appeals would be at least equal to, if not greater than, the disclosure right under FOIA."[13]
 
 
 30
 However, we do not wish our overruling of the Government's argument as to preclusion to be considered as approving LIA's decision to bring this action in the District Court for the Southern District of New York rather than in the courts of the District of Columbia.[14] When we questioned LIA's counsel why this had been done, the response was that, under 5 U.S.C. § 552(a)(4)(B), LIA had a statutory right to lay venue in the Southern District of New York since it had its principal place of business there. We do not regard this as a sufficient answer. Particularly in litigation as massive and complex as this, courts are entitled to receive a high degree of consideration and cooperation from counsel. Convenience would clearly have been served by LIA's bringing this proceeding in the District Court for the District of Columbia. While that court initially would have known no more about the case than the District Court for the Southern District of New York, there would have been opportunities for discussion and coordination with the Court of Appeals, e. g., on scheduling,[15] that were foreclosed by bringing the action in the Southern District of New York. Even more important any appeal in the FOIA action could have been heard by the same panel reviewing the lead standard, with great savings in judicial time and resources, as well as savings to the parties.[16] We cannot fathom why the defendants did not move for transfer under 28 U.S.C. § 1404(a), as was ordered in Ferri v. United States Department of Justice, 441 F.Supp. 404 (M.D.Pa.1977), on facts less compelling than here. If there should again be a case in this circuit where disclosure under FOIA is avowedly sought in aid of a review proceeding in another circuit, the district court should seriously consider a stay pending a FOIA application to the reviewing court or a transfer of its own motion to a district court in that circuit if this would be permissible.[17]IV.
 
 
 31
 It is necessary in assessing a FOIA claim to understand "the function of the documents in issue in the context of the administrative process which generated them." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 138, 95 S.Ct. 1504, 1510, 44 L.Ed.2d 2029 (1975). Accord, Renegotiation Board v. Grumman Aircraft Engineering Corp., 421 U.S. 168, 170, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975). Whether a particular document is exempt under (b)(5) depends not only on the intrinsic character of the document itself, but also on the role it played in the administrative process. See Montrose Chemical Corp. v. Train, 160 U.S.App.D.C. 270, 275, 491 F.2d 63, 68 (D.C.Cir.1974); Mead Data Central, Inc. v. United States Department of Air Force, 184 U.S.App.D.C. 350, 364-65, 566 F.2d 242, 256-57 (D.C.Cir.1977). The documents at issue here were developed in order to assist OSHA in discharging the statutory requirements of 29 U.S.C. § 655. In promulgating standards under that section, the Secretary of Labor's conclusions must be supported by "substantial evidence in the record considered as a whole." 29 U.S.C. § 655(f). Furthermore, the Secretary must publish a statement of reasons in the Federal Register whenever he promulgates a standard or changes an existing national consensus standard. 29 U.S.C. § 655(b)(8), (e). As noted, the hearings on the proposed lead standard resulted in a rule-making record of over 40,000 pages, dealing with complex medical and economic matters. The decisionmaker could not possibly read every page and master every detail of the record, nor was she required to do so. United States v. Morgan, 313 U.S. 409, 421-22, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) (Morgan IV); National Nutritional Foods Ass'n v. FDA, 491 F.2d 1141, 1144-46 (2 Cir.), Cert. denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974). She sought expert assistance from both within and without OSHA in interpreting the long, controversial and technical record. The documents at issue embody that assistance, not only as to what standard and subsidiary procedures to adopt, but also as to what reasons to rely on in the required statement in the Federal Register.
 
 
 32
 LIA's appeal is limited to the district court's refusal to order disclosure (save for various segments) of two post-hearing draft reports by outside consultants who submitted evidence at the rule-making hearings, designated respectively as the DBA and CPA reports. See note 1 Supra. The DBA report, a document of 117 pages, dated January 26, 1978, prepared by David J. Burton who had testified as to the feasibility of a 100 ug/m 3 standard, and his consulting firm D. B. Associates, Inc., was responsive to a request from OSHA to analyze the feasibility of a 50 ug/m 3 standard. Feasibility is one of the criteria which the statute specifically mandates the Secretary to consider, 29 U.S.C. § 655(b)(5); see S.Rep. No. 91-1282, 91st Cong., 2d Sess., U.S.Code Cong. & Admin.News at 5177, 5183 (1970); 43 F.R. 52953-54 (1978); American Petroleum Institute v. OSHA, 581 F.2d 493, 496-97 (5 Cir. 1978), Cert. granted, 440 U.S. 906, 99 S.Ct. 1212, 59 L.Ed.2d 453 (1979). The CPA report, a document of 192 pages, prepared by Nicholas Ashford and his Center for Policy Alternatives, dated July 1978, also commissioned by OSHA, is entitled "Analysis of Available Evidence on Blood Lead Air Lead Relationships Relevant to the Selection of a Permissible Exposure Limit for Lead in Air." One of the disputed points during the rule-making proceedings was whether the standard should be based on a biological or occupational enforcement limit. See 43 F.R. 52961 (1978). OSHA sought, in the CPA report, expert review of the record evidence concerning the correlation between an occupational limit and health effects. Without such a review, OSHA would have encountered both difficulty and delay in determining which approach the record supported.
 
 
 33
 The public portion of the record contains part of the instructions to DBA; we set these forth in the margin.[18] The record is less informative as to the impetus for the CPA report. However, the summary furnished by OSHA and our inspection indicate that it conforms to its title and analyzes the effect of various standards and degrees of compliance therewith upon the level of lead in the blood. In addition to helping formulate decisionmaking, both the DBA and CPA reports furnished material for the preamble to the final standards and the attachments thereto. Indeed, some paragraphs of the preamble are taken verbatim from these reports.
 
 
 34
 By its cross-appeal, the Government seeks to protect from disclosure all of the segments ordered disclosed (save some thirty-nine segments, disclosure of which it is not appealing since they clearly are already available to the public). Judge Sweet ordered disclosure of segments not only from the DBA and CPA reports just discussed, but also from a revision of part of the DBA report and four additional CPA reports. The CPA reports considered general feasibility questions and the benefits and costs of the medical removal protection program which OSHA adopted as part of the standard. See 43 F.R. 52972-77 (1978). This preventive health mechanism was one of the greatest points of controversy during the rule-making proceeding, so it is no surprise that expert assistance in analyzing the record was sought. Segments were also ordered disclosed from seven other documents produced by outside consultants,[19] considering questions about the MRP program, blood lead-air lead correlation, mortality evidence on the record, costs and feasibility, and statistical procedures. Portions of five OSHA staff documents were ordered revealed. These documents analyzed record evidence concerning lead effects on the nervous, renal, blood, and reproductive systems, as well as mortality. Such effects are, of course, important in considering what standard will guarantee that "no employee will suffer material impairment of health or functional capacity," 29 U.S.C. § 655(b)(5).
 
 
 35
 Three of the seven CWPS documents from which segments were ordered disclosed were analyses of the standard prepared by CWPS staff for the use of the Council Director, his staff or other agencies within the Executive Branch in evaluating the proposed standard. One of the CWPS documents was an OSHA summary of its proposed standard prepared for the use of CWPS, and the remaining three were CWPS documents evaluating the EPA ambient air quality standard for lead, which the Government claims were not within the scope of LIA's original FOIA request.[20] CWPS regularly reviews and comments upon the programs of federal agencies, pursuant to its statutory mandate to consider the inflationary effect of agency activity, 12 U.S.C. § 1904 (note); 6 C.F.R. § 701.6. OSHA would, of course, be interested in the CWPS economic analysis, as that reflected upon feasibility considerations of central concern to the validity of the OSHA rulemaking.
 
 V.
 
 36
 The Supreme Court has dealt with exemption (b)(5) in four cases: EPA v. Mink, 410 U.S. 73, 85-94, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973); NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); Renegotiation Board v. Grumman Aircraft Engineering Corp., 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975); and Federal Open Market Committee v. Merrill, --- U.S. ----, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979). The most important for present purposes is Mink both because it set the tone for the others and because it is the closest although not really close to ours on the facts. After stating that the exemption protects inter-agency communications only insofar as they "would not be available by law to a party . . . in litigation with the agency", the Court went on to say, in somewhat of a masterpiece of understatement, that "(d)rawing such a line between what may be withheld and what must be disclosed is not without difficulties" since "the rules governing discovery in such litigation have remained uncertain from the very beginnings of the Republic." 410 U.S. at 86, 93 S.Ct. at 835.[21]
 
 
 37
 In recognition of these dubieties, Justice White sought aid in the committee reports where he discerned a central concern behind the language of exemption (b)(5) that government agencies not be compelled to "operate in a fishbowl." S.Rep. No. 813, 89th Cong., 1st Sess., Source Book 44 (1965); see also H.R.Rep. No. 1497, 89th Cong., 2d Sess., Source Book 31 (1966). Application of the exemption thus required different treatment "for materials reflecting deliberative or policy-making processes on the one hand, and purely factual, investigative matters on the other." 410 U.S. at 89, 93 S.Ct. at 837.
 
 
 38
 Reviewing the cases available at the time of publication,[22] Professor Davis has said, 1 Administrative Law Treatise § 5:33 at 405 (2d ed. 1978):
 
 
 39
 The key to all the cases is that the fifth exemption protects the deliberative materials produced in the process of making agency decisions, but not factual materials, and not agency law.
 
 
 40
 Here we have no problem of nondisclosure of agency law the prime concern in the Sears case and a substantial one in Grumman. It is clear also that the materials are all pre-decisional and thus not within the portion of the Sears case ordering disclosure of opinions of the NLRB general counsel declining to prosecute. It is clear finally that the two reports at issue on LIA's appeal were "deliberative". As a result of the hearings OSHA had evidently become dissatisfied with the 100 ug/m 3 standard initially proposed and wished the advice of the consultants whether the record suggested the desirability of a more stringent standard and was adequate to support it, and, if these questions were answered affirmatively, the aid of the consultants in drafting a preamble explaining why the Assistant Secretary had opted for this.
 
 
 41
 We note preliminarily that in our view, nothing turns on the point that the DBA and CPA reports were prepared by outside consultants who had testified on behalf of the agency rather than agency staff. On this we have nothing that can usefully be added to Chief Judge Bazelon's statement in Soucie v. David, 448 F.2d 1067, 1078 n. 44, 145 U.S.App.D.C. 144, 155 (D.C.Cir.1971), which was adopted and followed in Wu v. National Endowment for Humanities, 460 F.2d 1030, 1032 (5 Cir. 1972), Cert. denied, 410 U.S. 926, 93 S.Ct. 1352, 35 L.Ed.2d 586 (1973).
 
 
 42
 Accepting Mink as we must, and Professor Davis' statement as we do, we do not find them of great assistance in dealing with the problem presented when a party to agency rule-making seeks disclosure of documents submitted to the agency by its staff or outside consultants to assist it in rendering an informed decision upon the typically Gargantuan rule-making record developed here. In such a case, disclosure of factual portions of the report may reveal the deliberative process of selection. See Montrose Chemical Corp. v. Train, 160 U.S.App.D.C. 270, 275, 491 F.2d 63, 68 (D.C.Cir.1974). This is not to say that all summaries are Ipso facto exempt from disclosure. Disclosure of purely objective summaries of the rule-making record may not threaten the deliberative process, although disclosure might be withheld on the different ground that the material was already available. See Bodner v. FTC, 1975-1 Trade Cases P 60, 171 at 65,555 (D.D.C.1975). Here, however, the DBA and CPA reports were more than mere summaries. In assisting OSHA, the consultants were asked to draw inferences and weigh the evidence. See note 18 Supra. Their function was not merely summary but analysis as well, and as such clearly implicated in the deliberative process by which the final standard was adopted and the reasoning behind it promulgated.
 
 
 43
 Against this LIA argues that the documents were not based solely on the public record, and therefore cannot be disposed of simply on the basis that they assisted the decisionmaker in analyzing that record. The detailed affidavits submitted by the Government in opposition to LIA's motion and in support of its own motion for summary judgment, make, on their face, a convincing case that the DBA and CPA reports were prepared from record materials for discussion within the OSHA staff and ultimate consideration by the decisionmaker. This case was strongly supported by the complete and informative indices furnished in response to the district court's order of March 16, 1979, and the table of contents of the DBA report and other excerpts from both reports that were voluntarily furnished. To counteract this LIA argues that OSHA sent DBA some materials that were not in the record and that the CPA report contained a rebuttal of criticisms of CPA's on-the-record testimony. However, in transmitting the off-the-record material to DBA, OSHA expressly instructed that "References supplied that are not in the record are for your own information only and should not be used as documentation for any conclusions." Portions of the DBA report that have been released to LIA affirm that only record materials were used and that where sufficient information in the record was not available to draw conclusions, no analysis was presented. We see no reason why these representations should not be accepted. Cf. Bristol-Meyers Co. v. FTC, 194 U.S.App.D.C. 99, 110-111 n. 23, 598 F.2d 18, 29-30 n.23 (D.C.Cir.1978); Morton-Norwich Prods., Inc. v. Mathews, 415 F.Supp. 78, 82-83 (D.D.C.1976). Certainly there would be no justification for holding that the entire report lost its exempt status because of use of some extra-record information (if such there was), as LIA seemingly would have us do, cf. Bodner v. FTC, 1975-1 Trade Cases P 60, 171 (D.D.C.1975), and it would be wholly impracticable for the district court In camera or for us to determine within any reasonable time frame whether any nonrecord facts were stated or were used. With respect to the CPA report, while this does contain an Appendix A entitled "Answers to Specific Criticisms of CPA Model", examination of the Appendix indicates that no new evidentiary material was adduced and the answers are of the same sort that could have been made by a knowledgeable member of OSHA's staff defending his expert witness' credibility before the decisionmaker. Whatever the propriety or impropriety of this and, of course, neither 5 U.S.C. § 556(d) nor § 557(d) was applicable to the rule-making here any efforts of CPA to sustain views expressed on the record against attack did not eradicate the "deliberative" nature of the CPA report.
 
 
 44
 For the foregoing reasons we find that the District Court was correct in characterizing the bulk of the DBA and CPA reports as exempt. We turn now to the various segments ordered disclosed in these two reports and the other documents.
 
 VI.
 
 45
 The district court ordered disclosure of seven segments of the DBA draft report, some 102 segments of the CPA report (mainly tables and graphs), 8 segments from a revised version of the DBA report, 52 segments from four additional CPA summaries, 37 segments from seven studies and memoranda prepared by other consultants, 83 segments from five reports prepared by persons believed to have been full-time agency staff persons, and excerpts from seven CWPS documents. The Government's affidavits claimed that all these documents were part of the deliberative process, the indices confirmed this, the district court did not conclude to the contrary, and despite the large number of segments ordered to be produced, some only a few lines, the district court held the great bulk of the documents to be entitled to the exemption.
 
 
 46
 The district court offered only two clues for its selection of segments in addition to the general statement quoted in Part II Supra. One was that whereas inferences drawn from the public record should not be disclosed "since they reflected on the question of which facts the decision makers considered important", "(i)nferences derived from facts which became part of the final record, (i. e., inferences that became findings of fact by OSHA) are to be disclosed." With all respect we cannot understand this; the interference with the free flow of discussion between staff (or outside consultants) and the decisionmaker depends on protection against any disclosure, not on whether the decisionmaker accepts, rejects or ignores the advice. If the judge was relying on the discussion in NLRB v. Sears, Roebuck & Co., supra, 421 U.S. at 152-53, 95 S.Ct. 1504, we believe he misconstrued it; what the Court ordered disclosed were the Appeals and Advice Memoranda of the General Counsel which concluded that no complaint should be filed and thus constituted final action by the NLRB not memoranda from subordinates recommending that course.
 
 
 47
 The court's discussion of the other clue begins by quoting a passage from the opinion in Mead Data Central, Inc. v. Department of the Air Force,188 U.S.App.D.C. 51, 54, 575 F.2d 932, 935 (D.C.Cir.1978), which distinguished "raw facts with informational value in their own right" from facts which "serve primarily to reveal the 'evaluative' process by which different members of the decision-making chain arrived at their conclusions." The district judge then said that "(t)his distinction relate(d) to those tables and graphs which are based on information not presented in the public record since they may alternatively serve both as valuable information in their own right or as reflective of deliberations involving still other information"; hence "OSHA may elect either to turn over the calculations themselves or, alternatively, to make public the raw data from which the conclusions have been drawn." We have several observations about this: To begin, we do not see the basis for the judge's view that the tables and graphs were, or may have been, based on information not in the public record; our study indicates that they are, or at least purport to be, based on factual discussions in reports which are stated to be based on facts in the record and serve merely as tabular or graphic summaries to facilitate understanding. They are no less a part of the deliberative process than the factual material on which they are based, and their disclosure would "compromise the confidentiality of deliberative information", Mink, supra, 410 U.S. at 92, 93 S.Ct. at 838, quite as much as disclosure of the discussion of the facts themselves.
 
 
 48
 While we have not examined each of the 350 segments subject to this appeal with the care required to make an informed determination as to each and could not do so with any reasonable expenditure of judicial resources or within the time frame pressed by plaintiff, we have delved deeply enough to be seriously troubled.
 
 
 49
 A determination of which if any portions of an otherwise exempt document are nonexempt must begin with a consideration of the nature of the document as a whole. Disclosure of "purely factual material" in otherwise exempt documents may be ordered only if the material "is severable without compromising the private remainder of the documents." Mink, supra, 410 U.S. at 91, 93 S.Ct. at 838. More is required than merely plucking factual segments from the reports there must be a sensitive reference to the relation of the factual segments to the report as a whole.
 
 
 50
 With respect to the DBA and CPA reports, LIA would presumably not claim the exemption would not cover a brief memorandum saying "We think a 50 ug/m 3 standard is medically desirable for the following reasons, which are supported by the record" or an equally brief one saying "We believe a 50 ug/m 3 standard is feasible for the following reasons which are supported by the record." We perceive no basis in principle for saying that the exemption should be forfeited or the courts burdened with nigh impossible tasks because the two reports here at issue went into much greater factual detail. Neither do we see why the exemption should be lost because a memorandum from staff or outside experts proceeded beyond a barebones summary of the record and drew inferences therefrom. We believe the proper rule, consistent with Mink and the other Supreme Court cases and most of the lower court decisions, notably Montrose Chemical Corp. v. Train, supra, and Mead Data Central, Inc. v. United States Department of Air Force, 184 U.S.App.D.C. 350, 368-69, 566 F.2d 242, 260-61 (D.C.Cir.1977), is this: If the factual materials are "inextricably intertwined" with policy making recommendations so that their disclosure would "compromise the confidentiality of deliberative information that is entitled to protection under Exemption 5," Mink, supra, 410 U.S. at 92, 93 S.Ct. at 838, the factual materials themselves fall within the exemption. See also Attorney General's Memorandum on the 1974 Amendments to the Freedom of Information Act 14 n. 8 (1975). Disclosing factual segments from the DBA and CPA summaries would reveal the deliberative process of summarization itself by demonstrating which facts in the massive rule-making record were considered significant by the decisionmaker and those assisting her. See Washington Research Project, Inc. v. HEW, 164 U.S.App.D.C. 169, 181-82, 504 F.2d 238, 250-51 (D.C.Cir.1974), Cert. denied, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975) ("the judgmental element arises through the necessity to select and emphasize certain facts at the expense of others").
 
 
 51
 The court also ordered disclosure of segments from 14 documents, including the DBA and CPA reports, which can be considered drafts of the preamble to the standards that appeared in the Federal Register, 43 F.R. 52952-53007 (1978), or the attachments thereto, 43 F.R. 54354-54509 (1978). It was improper to compel disclosure of these segments. Once again, instead of merely combing the documents for "purely factual" tidbits, the court should have considered the segments in the context of the whole document and that document's relation to the administrative process which generated it. Mink, supra, 410 U.S. at 91-92, 93 S.Ct. 827; Sears, supra, 421 U.S. at 138, 95 S.Ct. 1504. If the segment appeared in the final version, it is already on the public record and need not be disclosed. If the segment did not appear in the final version, its omission reveals an agency deliberative process: for some reason, the agency decided not to rely on that fact or argument after having been invited to do so. It might indeed facilitate LIA's attack on the standards if it could know in just what respects the Assistant Secretary departed from the staff reports she had before her. But such disclosure of the internal workings of the agency is exactly what the law forbids. Morgan IV, supra, 313 U.S. at 422, 61 S.Ct. 999; Montrose Chemical Corp. v. Train, supra, 491 F.2d at 68-71.
 
 
 52
 Beyond what has been said up to this point, if the proportion of nonexempt factual material is relatively small and is so interspersed with exempt material that separation by the agency and policing of this by the courts would impose an inordinate burden, the material is still protected because, although not exempt, it is not "reasonably segregable," under the final clause of § 552(b), see Mead Data Central, Inc. v. United States Department of Air Force, supra, 184 U.S.App.D.C. at 368-69, 566 F.2d at 260-61.[23]
 
 
 53
 In an elaborate footnote in its brief (p. 50), the Government lists numerous instances of inconsistencies in the court's designation of segments. Our examination of these, necessarily but unhappily made without benefit of adversarial comment, leads us to believe that the Government is largely right. Two tables ordered to be disclosed are identical with those appearing at 43 F.R. 52967 and 54400. Some of the segments are simply trivial; since our disclosure of such banalities cannot impair any government interest, we reproduce a few in the margin[24] simply to show the uselessness of much of the disclosure that was directed. Finally, some of the segments are unintelligible without the explanation offered in material not ordered to be disclosed.
 
 
 54
 We note these deficiencies not so much in criticism of the district judge's performance of his task within the time frame he imposed upon himself but rather as showing that he should not have undertaken it. The documents submitted for inspection consist of 540 pages dealing, for the most part, with highly technical matters which the most competent judge, unless peculiarly experienced in the field, would find it difficult to understand without assistance from counsel and/or experts; in addition the task which the judge assumed required familiarity with the 55 page closely printed preamble to the standards and the 155 pages of attachment published in the Federal Register. Indeed insofar as the judge relied on the point that certain matters were not in the public record, he would have to search the 40,000 pages of the record, which were not before him, and then compare them with the reports submitted In camera. Yet the judge, doubtless under the impulse of the direction in 5 U.S.C. § 552(a)(4)(D)[25] and the urging of plaintiff's counsel that early disclosure was needed because of the probability of argument of the petition for review in the D.C. Circuit Court of Appeals in the fall, performed the Herculean task of purging the documents in a maximum of 10 days. Even if the judge applied correct standards, which, as indicated, we doubt that he did, it is inevitable that under such a schedule serious inconsistencies and mistakes would creep in.
 
 
 55
 We think it was error for the judge to have ordered In camera inspection, and particularly to have done so without hearing argument specifically addressed to that issue.[26] Here again we find the guiding principle in Mink, supra, 410 U.S. at 92-93, 93 S.Ct. at 839. Mr. Justice White there said that while "(p) lainly, in some situations, In camera inspection will be necessary and appropriate . . . it need not be automatic." Although Congress thereafter in 1974 added § 552(a)(4)(B), which provides in pertinent part that a district court "may examine the contents of . . . agency records In camera to determine whether such records or any part thereof shall be withheld under any of the exemptions . . . and the burden is on the agency to sustain its action," thereby overruling so much of Mink as had prohibited any In camera inspection of classified material claimed to be exempt under § 552(b)(1), it is clear from the legislative history that the amendment merely "permit(s) such In camera examination at discretion of the court." H.R.Rep. No. 93-1380, Conference Rep. 93d Cong.2d Sess., 9 (1974).
 
 
 56
 In Weissman v. C. I. A., 565 F.2d 692, 696-98 (D.C.Cir.1977), a(b)(1), (b)(3), and (b)(7) case, the court emphasized the need for a restrained exercise of discretion with respect to In camera inspection where the Government's affidavits and actions made a plausible case for exemption, and also discussed the problem here presented, where although a document is generally exempt, "some bits of non-exempt material may be found among exempt material, even after a thorough agency evaluation." The court rejected the argument that this possibility automatically triggered In camera inspection. Taking note of the 1974 amendment of § 552(b) providing that any reasonably segregable non-exempt portion of an agency record should be released, the court said that "this addition was meant to endorse judicial decisions holding that Congress did not intend to exempt an entire document 'merely because it contained some confidential information' ", but that "neither the legislative history, nor court decisions have indicated that it was appropriate for the District Courts to undertake a line-by-line analysis of agency records in each case." The court concluded:
 
 
 57
 It is only where the record is vague or the agency claims too sweeping or suggestive of bad faith that a District Court should conduct an In camera examination to look for segregable non-exempt matter.
 
 
 58
 and
 
 
 59
 Where it is clear from the record that an agency has not exempted whole documents merely because they contained some exempt material, it is unnecessary and often unwise for a court to undertake such an examination.
 
 
 60
 These considerations are peculiarly applicable here. The Government submitted affidavits which on their face indicated that the documents fell within exemption (b)(5), and detailed indices fully complying with the requirements of Vaughn v. Rosen, supra, 157 U.S.App.D.C. 340, 484 F.2d 820, which were strongly supportive of that claim. The most that plaintiff can argue with any show of reason is that some documents, predominantly exempt, may contain some non-exempt factual material, some of which may not be available in the public record. Thorough testing of that claim would require, not the maximum of ten days which the district judge devoted to the task, but at least that many weeks, very likely with the aid of a special master, see Vaughn v. Rosen, supra, 157 U.S.App.D.C. at 348, 484 F.2d at 828, who, unless himself an expert in the pertinent medical and economic problems, would require the aid of specialists on these subjects. After decision by the district court, we then would be obliged to conduct an equally searching review, see Vaughn v. Rosen, supra, 157 U.S.App.D.C. at 345, 484 F.2d at 825, hopefully aided by a report from the special master, an opinion by the district judge, or both, all or parts of which, however, would have to be kept secret from the requester until our decision was rendered and perhaps thereafter. By the time the needed process had been completed in the district court and here, the review petition in the D.C. Circuit would long since have been argued and decided unless that court were to stay its proceedings. And all this to the end that plaintiff, who is entitled under 29 U.S.C. § 655(f) to have the standards set aside if they are not supported by substantial evidence in the record, see also 29 C.F.R. § 1911.15(a)(2), may obtain some small aid in that endeavor by finding a few nuggets of non-intertwined, "reasonably segregable", non-record factual information in one or more of the documents prepared for use by the Assistant Secretary or CWPS. While an action like this is within the letter of FOIA, see 1 Davis, Administrative Law Treatise § 5:7 (2d ed. 1978), it was surely not at or even near the core of the problem addressed by Congress, see Renegotiation Board v. Bannercraft Corp., 415 U.S. 1, 22, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974); NLRB v. Sears, Roebuck & Co., supra, 421 U.S. at 143 n. 10, 95 S.Ct. 1504, and the case for In camera inspection with the effort here demanded was correspondingly weak. The judge thus erred in requiring the Government to submit the documents for In camera inspection. Since such examination as we have been able to make has revealed nothing that clearly was disclosable, save for items like those in fn. 24 of which LIA is well aware, we reverse the disclosure order resulting therefrom.
 
 
 61
 So much of the order as refused disclosure is affirmed; so much as required disclosure is reversed. The district court is directed to dismiss the complaint.
 
 
 
 [1]
 Although LIA's notice of appeal covered all the documents subject to its FOIA request (save for the portions directed to be disclosed), LIA's brief in support of its appeal discussed and requested relief only as to the DBA and CPA reports. Its reply brief does not contest the Government's assertion that it has abandoned its appeal as to the portions of documents other than the DBA and CPA reports not ordered to be disclosed. See Herrmann v. Moore, 576 F.2d 453, 455 (2 Cir.), Cert. denied, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978)
 
 
 [2]
 Although the statute speaks of action by the Secretary of Labor, the pertinent regulations have delegated this authority to the Assistant Secretary for Occupational Safety and Health, 29 C.F.R. § 1911, who is also the chief executive officer of OSHA. References to the Assistant Secretary and OSHA are used interchangeably in this opinion
 
 
 [3]
 The proposed standard was to replace a previous "consensus standard" of 200 ug/m 3. See 29 U.S.C. § 655(a); 29 C.F.R. § 1910.100 (Table Z-2)
 
 
 [4]
 LIA and the Steelworkers were racing to different courthouses to take advantage of 28 U.S.C. § 2112(a), which provides for transfer of all review petitions to that court in which a petition was first filed. They finished in a dead heat, and the cases were eventually transferred to the D.C. Circuit "(f)or the convenience of the parties in the interest of justice." 28 U.S.C. § 2112(a). The story of the race and its outcome is told in United Steelworkers v. Marshall, 592 F.2d 693 (3 Cir. 1979). For the history of another case where zealous use of the elaborate machinery of pre-prepared petitions, open telephone lines etc. failed to produce the result desired by either racer, see Carrington, Crowded Dockets and the Courts of Appeals, 82 Harv.L.Rev. 542, 598-601 (1969)
 
 
 [5]
 These were:
 (1) All documents constituting, or referring or relating to, any communication between OSHA, on the one hand, and Nicholas Ashford, Dale Hattis, Center for Policy Alternatives, David J. Burton, D. B. Associates, Inc. (or any officer or employee thereof), John Short & Associates, Inc., Dr. Sergio Piomelli, Dr. Daniel Teitelbaum, Dr. Ruth Lilis, Dr. Alfred Fischbein, and/or Dr. Anna Maria Seppalainen, on the other, subsequent to January 1, 1977, concerning the Standard and/or the Record.
 (2) All documents constituting, or referring or relating to, any contract or agreement with, or requests to, any person other than OSHA, the Office of the Solicitor or the Department of Labor for the evaluation, appraisal and/or preparation of written summaries or descriptions of the Record, and also all documents constituting, or referring or relating to, instructions with respect to such contracts, agreements or requests. (For purposes of this Request No. 2, the terms "OSHA", "Office of the Solicitor", and "Department of Labor" shall not include any agent, independent contractor or other person not a full-time, salaried employee of those governmental units.)
 (3) All documents not protected by the attorney-client privilege constituting, or referring or relating to, any communication not protected by the attorney-client privilege between OSHA and the Office of the Solicitor subsequent to January 1, 1977, concerning OSHA's authority to promulgate, issue or enforce the Standard.
 (4) All documents constituting, or referring or relating to, any communication between OSHA, on the one hand, and any union or labor organization (or officer, employee, attorney, agent or representative thereof), on the other, subsequent to January 1, 1977, concerning the Standard and/or the Record.
 (5) All documents constituting, or referring or relating to, any communication between OSHA, on the one hand, and CEA, COWPS and/or RARG, on the other, subsequent to January 1, 1977, concerning the Standard and/or the Record.
 
 
 [6]
 This exempts from compulsory disclosure:
 inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.
 
 
 [7]
 (1) All documents constituting, or referring or relating to, any communication between or among COWPS, the Department of Labor and/or OSHA subsequent to January 1, 1977, concerning the Standard and/or the Record
 (2) All documents relating or referring to the cost, feasibility and/or economic or inflationary impact of the Standard.
 (3) All documents constituting, or relating or referring to, any communication between COWPS on the one hand, and CEA and/or RARG, on the other, concerning the Standard and/or the Record.
 
 
 [8]
 Later LIA exhausted its administrative remedies against CWPS and, on its application, the court granted leave to file an amended complaint and ordered that upon such filing the order of dismissal would be vacated. No amended complaint was ever filed and the Government claims this to be dispositive against any appeal by LIA as regards CWPS documents and, more important, see note 1 Supra, in favor of its cross-appeal against being required to disclose excerpts from them. LIA responds that the Government did not make this claim below and that everyone treated CWPS as a party once administrative remedies had been exhausted. While we do not understand LIA's failure to file an amended complaint with respect to CWPS, we are not disposed to place decision on so technical a ground as the Government urges
 
 
 [9]
 By subsequent additional motions to supplement the record, dated April 4 and May 1, ASARCO added three Vaughn indices (exhibits 92, 92a, 96), OSHA instructions to DBA in connection with their report (exhibit 93), and Judge Sweet's opinion of April 27 (exhibit 97)
 
 
 [10]
 Further disclosed segments of the DBA report (exhibit 94) were added by a subsequent additional motion to supplement the record, dated April 4
 
 
 [11]
 We choose not to rest our decision on this ground. While plaintiff may have been at fault in failing to answer this portion of the Rule 9(g) statement, the defendants were not left in doubt that in fact plaintiff denied that all the material in the requested documents was in the public record. Indeed, this was the very basis of the suit
 
 
 [12]
 If anything material is omitted from the record or is misstated therein, the parties may at any time supply the omission or correct the misstatement by stipulation, or the court may direct that the omission or misstatement be corrected and, if necessary, that a supplemental record be prepared and filed
 
 
 [13]
 By the same token, we reject LIA's argument that OSHA is collaterally estopped from opposing disclosure of the DBA report because it was ordered produced and in fact was produced in an unrelated OSHA enforcement proceeding before an administrative law judge, Marshall v. ASARCO, Inc. (OSHRC Docket Nos. 77-748 and 77-1730, September 5, 1978). That proceeding and disclosure order were hardly routine. The DBA report was produced under a severe protective order which restricted disclosure to named individuals and ordered that "said document and its contents shall not be referred to or used by any person in any adjudicatory proceeding except as it may be obtained in the usual course of discovery in said other proceedings." We thus do not need to consider other objections to LIA's argument
 
 
 [14]
 Although there had been some elaborate earlier skirmishing, see note 4 Supra, it was clear well before commencement of this action that the proceeding to review the lead standard would be in the District of Columbia
 
 
 [15]
 Another example is ASARCO's suggestion to the D.C. Circuit that it be allowed to file a bill of discovery in the district court for the District of Columbia; this might have had more appeal if the District Court had been seized of the litigation under FOIA
 
 
 [16]
 Indeed, we see no reason why LIA should not have made an FOIA request, additionally or alternatively, in the appellate review proceeding itself. The fact that § 552(a)(4)(B) of FOIA authorizes an action in a district court when an agency has refused to comply with an information request does not preclude a person's seeking relief in any action where the requested information is relevant, see 1 Davis, Administrative Law Treatise § 5.7 (2d ed. 1978), citing United States v. Wahlin, 384 F.Supp. 43 (W.D.Wis.1974) and Christy v. United States, 68 F.R.D. 375, 378 (N.D.Tex.1975). Professor Davis and the cited authorities, it is true, address only the propriety of a FOIA request in a pending district court proceeding, but we see no reason why the considerations justifying such action would not apply with equal force to a proceeding in a court of appeals. The only contrary authority, Echols v. NLRB, 525 F.2d 288 (6 Cir. 1975), was merely a cursory order and did not thoroughly consider the issue. However, the law on this subject is not clear enough to warrant any criticism for failure to follow the course here suggested, and we intend none
 
 
 [17]
 The broad language of 28 U.S.C. § 1404(a) would seem to permit a court to order transfer Sua sponte, see 5 Wright & Miller, Federal Practice & Procedure: Civil § 1352, p. 568 (1969 ed.). While § 1404(b) contains the proviso that transfer may be ordered "(u)pon motion, consent or stipulation of all parties," there is no such limitation in § 1404(a). See I-T-E Circuit Breaker Co. v. Becker, 343 F.2d 361, 363 (8 Cir. 1965). Cases addressing the question have been surprisingly few, but those that have arisen suggest such power does exist. See Stanley Works v. Globemaster, Inc., 400 F.Supp. 1325, 1338 (D.Mass.1975); Atlantic City Electric Co. v. I-T-E Circuit Breaker Co., 247 F.Supp. 950, 955 (S.D.N.Y.1965); Kearney & Trecker Corp. v. Cincinnati Milling Machine Co., 254 F.Supp. 130, 134 (N.D.Ill.1966)
 
 
 [18]
 Determine what conclusions the reulemaking (sic) record will support on the following questions and indicate the relative weight of the evidence supporting these conclusions. Do Not rely only on explicit commentary, but make all possible and reasonable inferences the evidence will allow
 Note: References supplied that are not in the record are for your own information only and should not be used as documentation for any conclusions.
 Further light is afforded by an Executive Summary which reads:
 This report is submitted pursuant to the requirements of Task Order No. 3, Contract No. J-9-F-6-0227. The report summarizes the technical feasibility of compliance with two proposed standards for lead in Battery Manufacturing, Secondary Smelting, Primary Smelting, and other industries.
 In order to carry out this Task Order, all of the relevant hearing Exhibits and transcripts were obtained by DBA for review. All documents were appropriately read, abstracted and analyzed for relevance in answering the questions of technical feasibility.
 During the past several years, OSHA has assembled a mass of data, visited scores of plants, published a proposed standard, invited public comment and participation, sponsored economic and environmental impacts studies, conducted hearings, held numerous meetings and is now preparing to finalize a permanent standard for occupational exposure to lead. This study has explored the technical feasibility of compliance with an airborne permissible exposure limit of 100 ug/m 3 standard, and with a 50 ug/m 3 standard. The question of technical feasibility must be resolved from among the massive amount of information which has been accumulated in the official record during the rule-making process.
 D. B. Associates, Inc. (DBA) was issued a Task Order to (1) search the record for applicable data, (2) evaluate that data, and (3) write a report which can be used by OSHA in the development of the preamble to the standard.
 This report represents the results of that task. An internal OSHA memorandum outlined a number of issues and objectives for the study. These general issues were rewritten by DBA in specific language such that specific answers could be formulated. All memoranda and directives associated with this project are found in the Appendix.
 
 
 [19]
 Three of the studies were prepared by Robert Jennings, pursuant to a full-time personal services contract with OSHA and under OSHA supervision. Mr. Jennings later became a Special Assistant to Assistant Secretary Bingham
 
 
 [20]
 The Government argues that these three documents, as well as an OSHA report prepared by an outside consultant on battery costs in relation to the EPA standard, were originally included in the Vaughn indices by mistake, and that they are not within LIA's request. Like the district judge, we consider the four documents fairly within LIA's request. Although they relate to costs associated with the EPA standard, these costs were highly relevant to OSHA's effort to isolate the additional costs associated with compliance with its own standard. See 43 F.R. 54494 (1978)
 
 
 [21]
 As Professor Davis has explained, a prime source of the difficulty is that the statute seems to assume that materials in agency files are either always or never discoverable whereas in fact the largest category consists of material that is discoverable under some circumstances but not others, e. g., where the need of the party seeking discovery is strong but not when it is weak. 1 Administrative Law Treatise § 5:33 at 404-05 (2d ed. 1978)
 
 
 [22]
 These included all the Supreme Court cases except the Open Market Committee case, which would not alter the conclusion
 
 
 [23]
 As put by Judge Tamm:
 For example, if only ten percent of the material is non-exempt and it is interspersed line-by-line throughout the document, an agency claim that it is not reasonably segregable because the cost of line-by-line analysis would be high and the result would be an essentially meaningless set of words and phrases might be accepted. On the other extreme, if a large proportion of the information in a document is non-exempt, and it is distributed in logically related groupings, the courts should require a high standard of proof for an agency claim that the burden of separation justifies nondisclosure or that disclosure of the non-exempt material would indirectly reveal the exempt information. Of course it is the cases in between these extremes which, no doubt, will more frequently present themselves to the courts and provide the true test for the procedures we have suggested. We therefore urge that they not be viewed as a thaumaturgic formula, but as a potentially useful approach, to be tried and improved by experience, as the courts struggle to strike a balance between the unavoidably conflicting values implicated by the segregability requirement of the FOIA.
 
 
 [24]
 Page A-699: "The demand for lead is derived from the demand for the products in which it is used."
 Page A-853: "Section 108(a)(2) and Section 109 of the Clean Air Act require EPA to set a standard for hazardous pollutants. The Act specifically states that the level 'shall reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health and welfare which may be expected from the presence of such pollutant in the ambient air, in varying quantities.' "
 Page A-872: "OSHA's original NPRM called for a 100 ug air standard. The final rule will call for a phased 50 ug air standard."
 Page A-895: "In 1975 the Natural Resources Defense Council (NRDC) and others brought suit against the EPA to list lead under Section 108 of the Clean Air Act as a pollutant for which air quality criteria would be developed and a National Ambient Air Quality Standard established under Section 109 of the Act. The Court ruled in favor of NRDC and EPA listed lead on March 31, 1976, and proceeded to develop air quality criteria."
 Page A-458: "Two studies of air lead-blood lead relationships in the primary smelting industry were performed by ASARCO. The 'El Paso Study' dealt with workers at one plant in Texas."
 Page A-859: "The Occupational Safety and Health Administration is in the process of finalizing its standard for occupational exposure to lead." (This sentence was repeated at pages A-862 and A-874 and again ordered disclosed.)
 
 
 [25]
 Except as to cases the court considers of greater importance, proceedings before the district court, as authorized by this subsection and appeals therefrom, take precedence on the docket over all cases and shall be assigned for hearing and trial or for argument at the earliest practicable date and expedited in every way
 
 
 [26]
 LIA included a suggestion for In camera review in its March 27, 1979, motion for summary judgment. The court requested a copy of the DBA report shortly thereafter, and was provided one on April 9. The court ordered production of all the other documents for In camera review on June 4, in an opinion addressing LIA's motion to amend its complaint to include CWPS, which had earlier been dismissed as a defendant due to LIA's failure to exhaust administrative remedies. In view of this, it is not clear that problems involved in an In camera inspection were seriously canvassed before the court directed submission of the documents