**CLEARY, GOTTLIEB, STEEN & HAMILTON, Plaintiff,**

v.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., Defendants.**

**Civ. A. No. 92–2192 (CRR).**

United States District Court, District of Columbia.

Nov. 26, 1993.

Charles F. Lettow, Michael R. Lazerwitz, and Michael A. Mazzuchi, Richard W. Hulbert, Evan A. Davis, Stephanie Cotsirilos, and Paolo de Kock of Cleary, Gottlieb, Steen & Hamilton, Washington, DC, for plaintiff.

Susan A. Nellor, Asst. U.S. Atty. together with Jay B. Stephens, U.S. Atty., and John D. Bates, Asst. U.S. Atty. (Mary Mitchell Armstrong, Office of the General Counsel, Dept. of Health and Human Services, of counsel), for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

On September 25, 1992, plaintiff Cleary, Gottlieb, Steen & Hamilton filed suit against defendants Department of Health and Human Services ("HHS"), Centers for Disease Control ("CDC"), National Institutes of Health ("NIH"), Food and Drug Administra-

tion ("FDA"), James O. Mason, M.D., Assistant Secretary for Health, and David A. Kessler, M.D., Commissioner of Food and Drugs. Seeking declaratory and injunctive relief under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), the Administrative Procedure Act, 5 U.S.C. § 701(a) ("APA"), and the Fifth Amendment of the Constitution, the plaintiff alleges that the defendants have (1) inadequately responded to the plaintiff's FOIA requests, and (2) improperly denied the plaintiff's requests that certain agency employees be permitted to give testimony in underlying lawsuits against plaintiff's clients Showa Denko K.K. ("SDK") and Show Denko America, Inc. ("SDA").

Before the Court are cross-motions for summary judgment.[1] In light of the papers filed by the parties, the underlying law, and the record herein, the Court shall grant in part and deny in part the parties' cross-motions for summary judgment.

## BACKGROUND

The plaintiff represents SDK, a manufacturer of the amino acid L-tryptophan, and its subsidiary, SDA, in a massive product liability litigation pending throughout the United States in both federal and state courts. SDK manufactured L-tryptophan from 1982 through November 1989, and SDA distributed it as a dietary supplement to wholesalers and retailers nationwide. In November 1989, the FDA, CDC, and other health authorities reported a possible link between the ingestion of L-tryptophan and a rare syndrome that has only recently been identified as eosinophilia-myalgia syndrome ("EMS").[2] Consequently, SDK immediately ceased production of L-tryptophan and voluntarily recalled products in which it was the sole or major component. Subsequent to its identification in 1989, researchers from the CDC, FDA, NIH, the Mayo Clinic, and SDK started an intensive analysis of products contain-

ing L-tryptophan to determine whether these products contain a contaminant causing EMS.

Since the identification of EMS in 1989, individual plaintiffs have filed over 1000 product liability actions in the United States against SDK, SDA, and other firms involved in the chain of L-tryptophan distribution. Pending in both state and federal courts throughout the country, these actions allege a causal link between L-tryptophan and EMS and seek hundreds of millions of dollars in compensatory and punitive damages. Approximately 700 cases against SDK and SDA have been consolidated in a multi-district litigation in Federal District Court in South Carolina entitled *In re: L–Tryptophan Litigation*, MDL–865 (D.S.C.) ("MDL"). Many plaintiffs contend that SDK and SDA violated the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*, by illegally importing L-tryptophan into the United States. Further, certain claimants allege that SDK failed to cooperate with government investigators, including those investigators who visited SDK's plant in Oita, Japan, in May, 1990.

Because of these allegations, SDK and SDA have sought information from the FDA regarding that agency's regulatory history of L-tryptophan, as well as information indicating the degree of cooperation between the firms and the federal investigators. Similarly, plaintiff has requested CDC records relating to and including underlying data for the national surveillance system instituted by the CDC. The plaintiff has made several FOIA requests at various times to the CDC, FDA, and NIH, seeking the release of various forms of information, including computer searches, statistical analyses, printouts, and software. In response, the CDC has released well over 25,000 pages of documents. Declaration of Laura W. Leathers, ¶ 33 ("Leathers Dec."). The plaintiff has also re-

---

**1.** The defendants filed a Motion to Dismiss, in part, and Motion for Summary Judgment. The defendants moved to dismiss certain FOIA claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Due to the extensive volume of papers filed by both parties, the Court shall address these arguments through the defendants' summary judgment motion.

**2.** The CDC defined EMS symptoms as (1) an eosinophil count greater than or equal to 1000 cells per cubic millimeter of blood, (2) muscle pain sufficiently severe to interfere with daily activities, and (3) absence of infections or disease to explain the first two symptoms. *See* CDC, 38 Morbidity & Mortality Weekly Rep. 758, 787 (Nov. 24, 1989).

quested permission to depose certain agency employees. Deeming the information from the requested records and testimony to be essential to the litigation defense of SDK and SDA, the plaintiff asserts that the FDA and CDC have improperly withheld information and illegitimately restricted its experts from being deposed.

The parties filed cross-motions for summary judgment on March 1, 1993. Due to the sheer volume of factual and legal issues involved in this case, as well as resolution of certain issues during the course of litigation, the Court has twice directed the parties to clarify the outstanding claims. *See*, Joint Status Report Regarding Current Status of Case and the FOIA Claims That Remain to Be Resolved of July 8, 1993 ("Joint Report"); Joint Memorandum Setting Forth Each Party's Position Regarding Issues and Claims That Remain to Be Resolved and Supporting Arguments, filed September 29, 1993 ("Joint Memorandum"). Nevertheless, the parties still disagree over the records that remain in dispute, as well as the legal issues before the Court.

### DISCUSSION

A party may obtain summary judgment by showing "that there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Federal Rules of Civil Procedure 56(c). Because there are many sets of records in dispute that implicate a variety of legal concerns, the Court shall set out each legal issue and address the disputed records in turn.

### I. FOIA

To meet the burden of summary judgment in a FOIA context, "the defending agency must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from [FOIA's] inspection requirements." *Goland v. Central Intelligence Agency*, 607 F.2d 339, 352 (D.C.Cir.1978), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980) (quoting *National Cable Television Ass'n v. Federal Communications Comm'n*, 479 F.2d 183, 186 (D.C.Cir.1973)).

**A. The defendants have adequately responded to all FOIA requests for documents pertaining to the published Kamb Study and the Miller Study, but must turn over the electronic version of the Swygert database to the plaintiff.**

The plaintiff contends that the defendants have failed to respond lawfully to its FOIA requests. At the heart of this claim, the plaintiff seeks access to the underlying documentation for certain critical studies performed by the government, information concerning the analysis and investigation of a possible causative link between L-tryptophan and EMS. Despite a series of requests and administrative responses, the plaintiff asserts that defendants have improperly applied exemptions and have failed to produce records which they are mandated to disclose under FOIA.

The parties are in agreement regarding the administrative proceedings subsequent to the plaintiff's FOIA requests of January 31, 1991, April 19, 1991, and January 22, 1992. Joint Statement of Material Facts, ¶¶ 44–59 ("Joint Statement").

In filing its January 31, 1991, FOIA request with the CDC, the plaintiff sought access to agency records relating to the CDC's investigation of EMS and its association with L-tryptophan. Joint Statement ¶ 44. On February 19, 1991, CDC released redacted correspondence on L-tryptophan in response, stating that it had deleted certain information in this correspondence under FOIA Exemption 6. *Id.* ¶ 45. On April 23, 1991, the CDC further released a set of microfilmed documents produced between August 1990 and January 1991, informing the plaintiff that CDC withheld documents under FOIA Exemptions 4, 5, and 6, 5 U.S.C. § 552(b)(4), (5) and (6). Joint Statement ¶ 46.

The plaintiff appealed the CDC's decision, but limited its appeal to challenging the withholding of "predecisional internal communications" under Exemption 5. *Id.* ¶ 47. Assistant Secretary Mason denied plaintiff's appeal in part, noting that information was being processed for release of certain stud-

ies, including *Source of L–Tryptophan Associated with Eosinophilia–Myalgia Syndrome*, conducted and reported by Lynn Miller, *et al.* ("Miller Study"), and *Eosinophilia–Myalgia Syndrome Among a Cohort of L–Tryptophan–Exposed Patients in a South Carolina Psychiatric Practice*, conducted and reported by Mary L. Kamb, *et al.* ("Kamb Study"). However, Dr. Mason stated that only a presentation of a different study, *Tryptophan Contaminants Associated with Eosinophilia–Myalgia Syndrome*, conducted and reported by Rossanne M. Philen, *et al.* ("Philen Study"), would be released, and that plaintiff's access to all other documents pertaining to the Philen Study would be denied under FOIA Exemption 5. Joint Statement ¶ 48.

On January 22, 1992, the plaintiff filed an additional FOIA request with the CDC, requesting records, questionnaires, computer tapes or disks, and other materials relating to a CDC study entitled *Eosinophilia Myalgia Syndrome: Results of National Surveillance*, JAMA, 1990–264: 1698–1703 ("Swygert Study"). Joint Statement ¶ 54. CDC responded by releasing on microfilm certain records generated from May through August, 1991, by informing the plaintiff that it was withholding certain documents under FOIA Exemptions 4, 5, and 6, and by notifying the plaintiff that the Public Health Service ("PHS") would be in contact regarding the availability of the Swygert Study. ¶ 55. Soon after, the PHS wrote a letter to the plaintiff informing it that FDA had no information regarding this study, that CDC has no additional records, and that "we believe that an adequate search of appropriate files was conducted." Complaint, Exhibit F.

Questioning the adequacy of the search, the plaintiff appealed the PHS response to the Swygert Study. More specifically, the plaintiff challenged the lack of agency records concerning cases dropped from the Swygert study, and requested that CDC officials query the coauthors of the study remaining with the CDC, the records custodian, and others, for information regarding the

location of responsive records. Joint Statement ¶ 58; Complaint, Exh. G. The plaintiff also referred to a different case in which Dr. Leslie Swygert, formerly of the CDC, gave sworn testimony that the CDC kept "back-up" documentation for the Swygert Study.[3] On June 25, 1992, Assistant Secretary Mason wrote to the plaintiff, denying its appeal by explaining that the CDC search was adequate.

With regard to the adequacy of defendants' responses to plaintiff's FOIA requests, three sets of materials are in issue. First, the plaintiff asserts that defendants have failed to disclose seven sets of documents and records relating to the Kamb Study, arguing that the plaintiff has identified missing documents and records, the plaintiff has not specifically searched for these materials, and that plaintiff's affidavits establish their non-production. The plaintiff also contends that defendants are unlawfully withholding 13 sets of documents and records relating to the unpublished Miller Study, in that the Philen Study relied upon such documents and records to reach its conclusions. Joint Memorandum, pp. 1–7. Furthermore, the plaintiff argues that the Swygert database exists, is segregable, and should be disclosed.

### 1. The Kamb Study

In regard to the documents relating to the Kamb Study, plaintiffs are misguided in seeking an order for the defendants to disclose the underlying documentation. The issue is not whether the plaintiff has received all relevant materials within contemplation, but whether an agency has reasonably searched its record system. "The adequacy of an agency's search is measured by a 'standard of reasonableness,' and is 'dependent upon the circumstances of the case.'" *Truitt v. Department of State*, 897 F.2d 540, 542 (D.C.Cir.1990), quoting *Weisberg v. Department of Justice*, 705 F.2d 1344, 1351 (D.C.Cir.1983). Defendants claim that their searches for records were adequate under FOIA, and the Court finds in this case that there is no issue of material fact relating

**3.** Complaint, Exh. H; *see Pawlonek v. Showa Denko K.K.*, Civil Action No. CV90–6900 (Dist. Ct., Swahoe Cty., Nev.)

to this contention. By conducting three separate searches for records relating to the Kamb Study, the CDC has satisfied the required standard of reasonableness and adequacy.

After undergoing its original search, CDC released a microfilm of Kamb documents to plaintiff. Leathers Dec. ¶ 14. Next, as a result of its agreement to perform a further search for "missing" Kamb documents, CDC again searched in response to each of nine categories of documents requested by plaintiff; for each category, the CDC either provided the relevant documents, stated that no such document existed, or stated that no such document could be located. *See* Letter of June 21, 1993, from Mary Mitchell Armstrong, Joint Report, Exhibit 2. Moreover, after plaintiff's counsel again requested documents related to the Kamb Study, Agency counsel once again contacted Dr. Kamb, but failed to obtain any additional information. *See* Letter of July 2, 1993, from Mary Mitchell Armstrong, Joint Report, Exhibit 6.

The Court finds that CDC's efforts entitle it to summary judgment regarding the adequacy of its search for the Kamb records. "In order to obtain summary judgment the agency must show that it has made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. Department of the Army*, 920 F.2d 57, 68 (D.C.Cir.1990). *Oglesby* ruled that genuine issues of material fact existed concerning the adequacy of a search where the Department of State only searched the record system most likely to produce responsive documents, and failed to explain in its affidavit why no other record

system was likely to produce responsive documents. *Id.* In contrast, as the letters indicate, the CDC's multiple inquiries for the requested documents—such as computer printouts and telephone questionnaires—involved frequent contact with Dr. Mary Kamb herself as well as searches in her files. The plaintiff presents no affidavit or argument that the CDC acted in bad faith or executed a search that was not "reasonably calculated to uncover all relevant documents." [4] *Id.*

### 2. The Miller Study

■ With regard to the Miller Study, at issue is whether the CDC disclosed all records in response to plaintiff's January 31, 1991, FOIA request and its subsequent July 28, 1992 FOIA request (which is not at issue in this litigation).[5] Because the defendants adequately responded to these requests as they pertain to the Miller Study, the Court shall grant their motion for summary judgment on this issue.

The plaintiff argues that the only document it received was the draft study, and none others. Paola M.G. De Kock, the Cleary, Gottlieb attorney in charge of maintaining the FOIA records received from the CDC, swears that no other records on this subject were included in the released materials. Affidavit of Paola M.G. De Kock. According to the plaintiff, the "Philen Study makes explicit that it relied upon documents and records relating to the Miller study in order to reach its conclusions." Joint Memorandum at 8. Further, Cleary Gottlieb charges that defendants have not identified which records it released, nor at what time.

The Court concludes that the CDC's response to the plaintiff's FOIA request for

---

4. In fact, plaintiff never even addresses the issue of reasonableness head-on. Plaintiff focuses on the non-production of documents rather than the adequacy of the search. *See* Joint Memorandum at 4 ("Despite repeated requests, defendants have failed to provide the missing documents and records.... Moreover, the affidavits submitted by plaintiff establish that defendants have not produced those missing documents and records."). However, a mere deductive inference that a record "must" exist, without proof, does not raise a material issue of fact regarding the adequacy of an agency's search. This Circuit has definitively stated that "[a] search is not unreasonable if it fails to produce all relevant material," looking to

the method of search rather than sheer results. *Meeropol v. Meese*, 790 F.2d 942, 952–53 (D.C.Cir.1986).

5. The parties are in sharp disagreement over the issues before the Court. Plaintiff contends that although the Miller study itself has been released, at issue is whether the defendants must disclose the documents and records relating to the Miller study. In light of the statutes and cases governing FOIA, the Court chooses to analyzes this dispute by tracing the administrative history of each request.

records pertaining to the Miller Study was adequate. Defendants released records concerning the Miller Study in response to an appeal to the January 31, 1991 FOIA request. To the best of the knowledge of Lawrence Posey, the deputy chief in charge of collecting and compiling CDC's records concerning EMS and L-tryptophan in response to FOIA requests, "all records underlying [the Miller Study] in the possession of CDC have been produced." Declaration of Lawrence Posey ("Posey Dec.") ¶ 5.

█ Significantly, there is no evidence that the plaintiff appealed the completeness of the records released. Although defendants cannot cite the date nor content of released documents, counsel for both parties admitted at the motions hearing of October 8, 1993, that they did not know of any duty to maintain such a record of disclosure. While Ms. De Kock has sworn that she did not receive the requested documents, that does not alter the reality that there is no genuine issue of material fact to indicate that defendants did not respond adequately to the FOIA request. The legal tests used in challenging a response to a FOIA request are means-based rather than result oriented, and defendants touched all the necessary bases—they made a reasonable search for records connected with the Miller Study, and made a good-faith production of them. Regardless of whether the plaintiff in fact received the requested records, this Court emphasizes that federal district court is not the appropriate forum for an initial complaint of incompleteness.

### 3. The Swygert Database

The plaintiff points to four factual bases for its argument that Dr. Swygert's database exists, is identifiable and segregable, and should be disclosed: (1) that researchers used her data after Dr. Swygert completed her work; (2) that defendants recently generated a "second" Swygert database; (3) that defendants have specifically acknowledged a copy of the surveillance database that is presently in use; and (4) that CDC maintains a surveillance database which includes Dr. Swygert's dataset.[6] Joint Memorandum at 5–6. Furthermore, the plaintiff asserts that defendants cannot evade FOIA merely by adding more data to the database.

Defendants counter that their response was reasonable, and that there is no basis to create a triable issue of fact regarding the thoroughness of their search. Defendants contend that their search for records pertaining to the Swygert Study were reasonably calculated to locate responsive records, and that the Swygert database has been sufficiently disclosed.

█ The plaintiff has carried its burden for summary judgment on this issue, but is only entitled to a copy of the Swygert database in electronic format. The plaintiff correctly argues that defendants must release the "second" Swygert database as it exists today. According to the defendants, the CDC has already turned over to the plaintiff the one existing database used by Dr. Swygert; all other programs have already been erased. See Leathers Dec. ¶ 32. There is no factual question on this point.[7] However, there is a second "existing" Swygert database, albeit a modified version of the database already released by the defendants to the plaintiff. See Posey Dec. ¶ 2. While the plaintiff is not entitled to receive updated materials in this context without filing additional requests, see Mandel Grunfeld & Herrick v. Customs Serv., 709 F.2d 41, 43 (11th Cir.1983) ("Nothing in the FOIA can be construed as requiring an agency to set up a mailing list to automatically disseminate agency records or information."), the electronic database existed at the time of the original FOIA request and is responsive to it.

6. Plaintiff claims that the Posey Dec. supports their contention that a segregable Swygert dataset must be disclosed:

> CDC maintains a surveillance database of cases involving EMS ..., the case surveillance database. Included within this surveillance database is the dataset which Dr. Leslie Swygert used for her case surveillance study....

> Since Dr. Swygert completed her study, the case surveillance database has changed as more data has been added.

Posey Dec. ¶ 2.

7. Plaintiff's insistence that some other relevant, unreleased database exists is factually without basis.

■ Apart from the electronic database, the defendants have sufficiently responded to the plaintiff's FOIA request, and need not separate out any data. Defendants' search for records was thorough and reasonable. The CDC originally released Swygert Study records on microfilm. In response to plaintiff's appeal, CDC employees searched for additional records in the division where she used to work, checked the CDC's mainframe computer, and contacted Dr. Swygert for a copy of her database. In addition, CDC's FOIA officer contacted the study's co-authors, and the study's custodian. None of the individuals that were contacted knew of any existing responsive records that had not been released. Defendants did release a database from the mainframe that was used at some point by Ms. Swygert. Therefore, according to the letters describing the agencies' efforts, the scope of the search meets the "reasonably calculated" standard articulated in *Oglesby*.

■ Not only have the defendants taken all the necessary steps in their search, but have also complied with their duty to segregate and release requested non-exempt materials. *See* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."). Plaintiff's argument that the CDC has unlawfully failed to separate out and re-create the original Swygert database does not comport with our Circuit's guidance on this issue:

> It is well settled that an agency is not required by FOIA to create a document that does not exist in order to satisfy a request. A requester is entitled only to records that an agency has in fact chosen to create and retain. Thus, although an agency is entitled to possess a record, it need not obtain or regain possession of a record in order to satisfy a FOIA request.

*Yeager v. Drug Enforcement Admin.*, 678 F.2d 315, 321 (D.C.Cir.1982) (citations omitted). The defendants have released the

hardcopy of an identifiable database that Dr. Swygert used which is still in existence, and shall release the existing electronic one; they have no further duty.

■ The plaintiff reveals an apparent misunderstanding of FOIA's duty to segregate and the underlying policy behind it. Dissatisfied with the case report forms disclosed by the defendants because they "do not contain all of the data cited and used in the Swygert study," the plaintiff complains that it "cannot reconstruct the Swygert database using the case report forms." Joint Memorandum at 6. Any attempt to burden defendants with the reconstruction of a record is unfounded. While defendants were obliged to sort through and release mountains of paper, FOIA imposes no further duty to tailor additional records to plaintiff's specifications. As the *Yeager* court concluded after analyzing FOIA's legislative history and jurisprudence, "[a] requester must take the agency records as he finds them." [8] *Id.* at 323.

**B. The plaintiff may not raise the issues of completeness and intelligibility of CDC records before this Court, because the plaintiff has not appealed their unintelligibility to the CDC and therefore has failed to exhaust its administrative remedies.**

■ The plaintiff argues that the CDC's microfiche and microfilm production of records, in response to plaintiff's requests of May 3, 1990, January 31, 1991, and April 19, 1991, is largely unintelligible. Citing instances of illegible photocopying, missing documents, and absent appendices, among other flaws, it seeks a complete set of properly indexed documents.

■ Without question, a FOIA respondent has a duty to release legible, complete records. *See Mead Data Central, Inc. v. Department of the Air Force*, 566 F.2d 242, 260 (D.C.Cir.1977) ("The focus of the FOIA is information, not documents"); *Grove v. Department of Justice*, 802 F.Supp. 506, 579

---

**8.** The Court wishes to emphasize that the plaintiff is entitled to the electronic database solely because this existing record is responsive to its FOIA request. Whether this release actually leads to a reconstruction of the database underlying the Swygert Study is irrelevant to this litigation.

(D.D.C.1992) (a FOIA requester is "entitled to receive legible copies of documents that are responsive to his request and are not exempt"). While the Court is aware that the vast scope of the information released by the government may lead to problems of intelligibility, the Court again stresses that federal district court is *not* the forum for an initial assertion of non-compliance on these grounds. As our Circuit has stated:

> Exhaustion of administrative remedies is generally required before filing suit in federal court so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision. The exhaustion requirement also allows the top managers of an agency to correct mistakes made at lower levels and thereby obviates unnecessary judicial review.

*Oglesby*, 920 F.2d at 61. FOIA specifically sets out an administrative appeal process subsequent to an agency's denial of a FOIA request. 5 U.S.C. § 552(a)(6)(A)(i), (ii). Caselaw requires a requester to exhaust this appeal process prior to filing a lawsuit. *See Oglesby* at 61; *Dettmann v. Department of Justice*, 802 F.2d 1472, 1477 (D.C.Cir.1986).

Based on the affidavits submitted, there is no dispute that the CDC has made a prompt, good-faith effort to correct or replace all incomplete or unintelligible documents brought to its attention.[9] The plaintiff did not file an appeal with the CDC's disclosures to Plaintiff's requests of May 3 and April 19, Leathers Dec. ¶ 24. The plaintiff did administratively appeal CDC's response to its January 31, 1991, request, but restricted its appeal to CDC's assertion of FOIA Exemption 5. *Id.*, ¶ 13. The plaintiff never filed an appeal (nor even informed the CDC) regard-

ing the issues of completeness or sequence of the released documents. *Id.* ¶¶ 8, 24.

The statutory scheme directs the plaintiff first to appeal to the CDC before raising issues of intelligibility in this Court. *See Oglesby* at 65 ("We therefore interpret 5 U.S.C. §§ 552(a)(6)(A) and (C) as requiring the completion of the administrative appeal process before courts become involved, if the agency has responded to the request before suit is filed"). In addition, the facts in this case implicate the policy reasons behind the rule mandating the exhaustion of administrative remedies. As the CDC's documentation shows, expertise, uniformity, fairness and conservation of judicial resources would best be served by appealing questions of intelligibility directly to the agency that has handled over 200 FOIA requests for L-tryptophan documentation and has an institutional framework established to respond to them. Therefore, no issues of completeness or legibility are properly before this Court.

 The plaintiff also argues that CDC must release documents responsive to its April 19, 1991 request in the orderly indexed and tabbed format that CDC had released to Congressmen Ted Weiss. Citing *Department of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 771, 109 S.Ct. 1468, 1481, 103 L.Ed.2d 774 (1989), the plaintiff argues for identical documentation, as "the identity of the requesting party has no bearing on the merits of his or her FOIA request." This claim has no merit, because (1) Congressman Weiss did not receive the documents as a result of a FOIA request, but rather in his role to review the federal governments's regulation of L-tryptophan, and (2) the index disclosed to him was not a FOIA index. *See* Plaintiff's Memo, Exhibit D; *Salisbury v. United States*, 690 F.2d 966,

---

9. "As plaintiffs acknowledge, CDC released over 25,000 pages in response to plaintiffs' FOIA requests. In November, 1991, plaintiffs did contact this office to complain about the quality of the microfilm reels that CDC had sent to it on April 23, 1991, and on May 30, 1991. A member of my staff, Lynn Armstrong, sent plaintiffs another set of the same microfilm reels. When plaintiffs again complained about the microfilm, it was Ms. Armstrong's understanding that plaintiffs were complaining about the clarity of this set of microfilm. She therefore sent plaintiffs a

master copy of the microfilm set. It was not until plaintiffs' counsels met with the government's counsels on January 21, 1993, that CDC learned that plaintiffs were contending that the pages of documents were missing or microfilmed in such a way as to be unintelligible. My staff and I have responded to over 200 requests for the agency's L-tryptophan records by releasing the L-tryptophan records on microfilm or microfiche. *We have not received any other complaints that the microfilmed documents are unintelligible.*" Leathers Dec. ¶ 26 (emphasis added).

971 (D.C.Cir.1982) ("The fact of disclosure of a similar type of information in a different case does not mean that the agency must make its disclosure in every case.").

### C. Although the software programs created by Dr. Rossanne Philen are agency "records" under FOIA, these programs and related records prepared by Dr. Philen and her collaborators fall within the deliberative process privilege of FOIA Exemption 5, and therefore were properly withheld by the CDC.

At this stage of the litigation, the disagreement over the release of the remaining information underlying the Philen Study is purely a legal question. There is no dispute that the Philen Study is a statistical analysis of impurities in L-tryptophan associated with EMS, nor is there any dispute that the CDC continues to withhold, under FOIA Exemption 5, the following information, all of which existed on October 18, 1991, when Dr. Mason responded to plaintiff's appeal of its January 31, 1991 FOIA request: the databases and special database files created for the study, their indices, printouts of statistical results, handwritten notes, an analysis of one database and an initial draft of the manuscript. Joint Statement ¶ 50. At issue are (1) whether the software programs created by Dr. Philen in conjunction with the Philen Study are agency "records" under FOIA; and (2) whether an initial draft of a manuscript of the study and the software programs (in the event the Court finds them to be agency "records") prepared by Dr. Philen and her collaborators in conjunction with the Philen Study were properly withheld by CDC under FOIA Exemption 5 as deliberative process records.[10]

As the defendants note, the question of whether a computer program is considered to be an "agency record" under FOIA is unresolved in the courts. The plaintiff asserts that the software programs are "records" under the APA, 5 U.S.C. § 552(a)(4)(B), and that the plaintiff is shirking its duty to disclose by withholding information because it is stored in electronic form. The plaintiff points to a recommendation to agencies subject to FOIA made by the Administrative Conference of the United States, which stated that "[i]n interpreting the Freedom of Information Act, agencies should recognize that 'record' includes information maintained in electronic form." 1 C.F.R. § 305.8–10, at 227. For the purposes of complying with FOIA's mandate to segregate information stored on computers, our Circuit has ruled that FOIA does not distinguish "between records maintained in manual and computer storage systems." *Yeager v. Drug Enforcement Admin.*, 678 F.2d 315, 321 (D.C.Cir.1982).

The defendants claim that the software are not records, relying on the statements of the program's creator that each program is merely a list of instructions for a computer to manipulate a database. Declaration of Rossanne M. Philen, M.D. ("Philen Dec.") ¶ 8. Defendants cite general case law to assert the general proposition that a "record" is a medium to record and preserve information. *See, e.g., Diviaio v. Kelley*, 571 F.2d 538, 542 (10th Cir.1978) (defining a record as "that which is written or transcribed to perpetuate knowledge or events"). Reasoning that the sequence of instructions in dispute, as software, is distinguishable from the underlying and separable sets of data, the defendants

---

10. Plaintiff asserts that an additional issue is whether database files, printout files (hard copy and those stored on computer), handwritten notes, and an analysis of the database prepared by researchers in conjunction with the Philen Study were properly withheld by the CDC under FOIA Exemption 5. The CDC is currently processing the underlying data for the Philen Study (apart from the computer programs and the manuscript draft), and will soon release to plaintiff records responsive to plaintiff's FOIA request to the CDC.

As far as the Court can make out, all other materials are those of the Miller Study, and the defendants have disclosed all such materials that are in their possession. As discussed *supra*, defendants have not been able to locate any other Miller Study records.

The Court also takes notice of the fact that defendants are no longer asserting the confidential research privilege under FOIA Exemption 5.

arrive at the conclusion that the computer program is not an agency record.[11]

In light of FOIA's well-known purpose to encourage access, the applicable caselaw, and specific facts before it, the Court concludes that these programs are records for the purposes of this litigation. Recognizing that Congress has not defined agency records under FOIA, the Supreme Court has looked to the Records Disposal Act as influential to judicial interpretation, and noted that it includes "machine readable materials ... regardless of physical form or characteristics." *Forsham v. Harris*, 445 U.S. 169, 183, 100 S.Ct. 977, 985–86, 63 L.Ed.2d 293 (1980) (quoting the Disposal of Records Act, 44 U.S.C. § 3301). HHS's own regulations provide that agency records include "magnetic tapes, cards or discs." 45 C.F.R. § 5.5.

More importantly, the computer software is an agency record under the common-sense definition in *DiViaio*, which the defendants endorsed. Unlike generic word processing or prefabricated software, Dr. Philen's programs are uniquely suited to its underlying database. As a consequence of this tailoring, the software's design and ability to manipulate the data reflect the Philen Study. These programs preserve information and "perpetuate knowledge" that are responsive to plaintiff's FOIA request because of their relation to the Philen Study.

▮ Next, the Court looks to whether the computer software programs and draft manuscript should be exempt from mandatory disclosure under the deliberative process privilege. The standard for this privilege is well-established in this Circuit. To qualify under this exemption, information must be both "predecisional" and "deliberative." This exemptions covers work-product which indicates the author's personal opinion rather than the agency's. *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866–69 (D.C.Cir.1980); *see Jordan v. Department of Justice*, 591 F.2d 753, 772 (1978) (declaring that the deliberative process privilege "attaches to all inter- and intra-agency commu-

nications that are part of the deliberative process preceding the adoption and promulgation of an agency policy").

▮ Although there is no touchstone in applying this privilege, opinion is generally protected, in contrast to factual information. *See Environmental Protection Agency v. Mink*, 410 U.S. 73, 87–91, 93 S.Ct. 827, 836–38, 35 L.Ed.2d 119 (1973). However, this distinction between fact and opinion may not be conclusive, as "the disclosure of even purely factual material may so expose the deliberative process within an agency" to warrant the application of the privilege to that material. *Mead Data Central, Inc. v. Department of Air Force*, 566 F.2d 242, 256 (D.C.Cir.1977). This privilege furthers three policy bases, in that it (1) promotes broad consideration of alternatives and improves the quality of decisions; (2) prevents premature disclosure of ongoing discussions that might confuse the public; and (3) protects the integrity of the decision-making process, by making sure officials are judged on what they decide, not what they consider. *Jordan* 591 F.2d at 772–73.

▮ The Court concludes that under the deliberative process privilege, the CDC properly withheld the draft of the manuscript prepared by Dr. Philen for review by her collaborators. This draft is pre-decisional inherently, and deliberative because it was created for the candid review and discussion among Dr. Philen and her research colleagues. Further, because the final manuscript was published, releasing the draft manuscript would not disclose any new data. From a policy perspective, as outlined in *Jordan, supra*, the disclosure of such draft documents would undercut the openness of decision-making embodied by Exemption 5.

▮ The Court also concludes that the computer software programs are also privileged under this exemption. Dr Philen's work involved frequent evaluation and analysis of her data:

---

11. The Court is aware that Laura W. Leathers, the FOIA Coordinator at HHS, and Dr. Philen herself, have stated their belief that the computer programs were not agency records within the meaning of FOIA. Leathers Dec., ¶ 17; Philen

Dec., ¶ 8. Dr. Philen stated that the programs she created are not intended to record information. The Court is not persuaded by their legal conclusions.

The process of epidemiological study involves continuous changes in the selection and examination of data....

Throughout this study I continued to modify my programs and to produce revised printout files as I formulated and then reformulated my hypotheses based on my analyses of previous printout files and my discussions with my collaborators.

Philen Dec., ¶ 17. These programs were designed to manipulate a set of data in a certain way, so the scientific deliberations and opinions are "inextricably intertwined" with the underlying facts.

More to the point, the computer software involved with the Philen Study is within the protected sphere of the deliberative process privilege, because these the privilege encompasses the decision-making process behind the culling and selection of relevant facts. Our Circuit recently decided a similar issue in *Mapother v. Department of Justice,* 3 F.3d 1533 (D.C.Cir.1993), which shielded the Office of Special Investigations' compilation of source materials relating to Kurt Waldheim's activities, which was prepared in order to determine whether Mr. Waldheim should be allowed to enter the United States. That court stated that

> selection of the facts thought to be relevant clearly involves "the formulation or exercise of ... policy-oriented *judgment*" or "the process by which *policy* is formulated," *Petroleum Info. Corp. [v. United States Department of Interior],* 976 F.2d [1429] at 1435 [ (D.C.Cir.1992) ] (emphasis in original), in the sense that it requires "exercise of discretion and judgment calls." *Id.* at 1438. Such tasks are not "essentially technical" in nature, *Id.* at 1437–38; rather they are part of processes with which "[t]he deliberative process privilege is .. centrally concerned."

*Mapother,* 3 F.3d at 1539. *Mapother* concluded that the government properly withheld the Waldheim Report, and the bulk of that Report's "factual material was assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action." *Id.* at 1539.

This Court holds that the computer programs reflect their creator's mental processes, and therefore fall under Exemption 5. "The work of ... assistants in separating the wheat from the chaff is surely just as much part of the deliberative process as is the later milling by running the grist through the mind of the administrator." *Montrose Chemical Corp. v. Train,* 491 F.2d 63, 70 (D.C.Cir.1974), *quoted in Mapother,* 3 F.3d at 1538. The software programs merely memorialize this separation magnetically, translating the culling process envisioned by the creators into a language that the computer can follow.

## II. APA

The plaintiff also challenges the government's refusal to permit four employee doctors to testify in the MDL proceedings. The same standard of law applies to the decisions to deny plaintiff's request for testimony from each researcher. Under the APA, judicial review is limited to determining if agency decisions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. The party alleging irregularity carries the burden of proof. *Schweiker v. McClure,* 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982).

In applying the "arbitrary and capricious" standard, a district court should undergo a "thorough, probing, in-depth review" of the agency's actions to ensure that they were based on reasoned decisionmaking, but should not substitute its own judgment. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). This standard should be applied with regard to the nature and context of the challenged action, *ITT World Communications, Inc. v. FCC,* 699 F.2d 1219, 1245 (D.C.Cir.1983), *rev'd on other grounds,* 466 U.S. 463, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984), and no action should be set aside if the action is rational, based on relevant factors, and within the agency's statutory authority. *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–24. The HHS' and FDA's denial of permission for Drs. Crofford Love, Archer, and Page to testify in the MDL proceedings were not arbitrary, capri-

cious, an abuse of discretion, nor otherwise contrary to law, because the government had a rational basis due to the potential to compromise the appearance of impartiality in related litigation, the existence of other experts who could provide the necessary information, and the disruption of the official duties of the agency.

*A. Based on the administrative record before it, the HHS's decision not to allow Dr. Crofford and Love to testify in the MDL proceedings was not arbitrary, capricious, an abuse of discretion nor otherwise not in accordance with law.*

The factual background of the plaintiff's request for NIH testimony is undisputed. *See* Joint Statement ¶¶ 32–40. In November 1990, Dr. Leslie Crofford and other researchers from CDC, NIH, and FDA published *L–Tryptophan Implicated in Human Eosinophilia-myalgia Syndrome Causes Fascitis and Perimyositis in the Lewis Rat*, 86 J. Clinical Investigation 1757 ("Lewis Rat I"), which reported specific inflammatory changes in the rats after exposure to L-tryptophan. Joint Statement ¶ 32. Lewis Rat I is often cited as a model for human EMS. Dr. Lori Love and other researchers from the CDC, NIH, and FDA presented a scientific poster entitled "L–Tryptophan and 1,1′ Ethylidenebis (Tryptophan), A Contaminant in Eosinophilia Myalgia Syndrome, Cause Myofascial Thickening and Pancreatic Fibrosis in Lewis Rats" ("Lewis Rat II"), in November 1991. Joint Statement ¶ 33. The data regarding the contrasting results between the two studies are unavailable in the Lewis Rat I article, the Lewis Rat II poster or literature put out by the CDC, FDA or NIH. Joint Statement ¶ 34.

In its letter of July 31, 1992, the plaintiff requested that Dr. James O. Mason, Assistant Secretary for Health, permit Drs. Crofford and Love of NIH to testify in depositions in MDL proceedings regarding their research and development of an animal model for human EMS. Joint Statement ¶ 34. That letter states that their testimony would be pertinent on the causation issue of litigation and therefore would advance public health, that the information it seeks is not available to the public, and that the plaintiff will take all steps possible to conserve agency resources and avoid the appearance of impartiality. Joint Statement ¶ 36–37. Before HHS responded, the Chief Counsel for the Public Health Service wrote in a letter that "[p]ermitting Dr. Love to testify … conceivably could compromise or complicate FDA's defenses to [those] suits," and that "Drs. Love and Crofford have indicated that there are other experts who could provide information related to EMS and L-tryptophan." Joint Statement ¶ 39. Dr. Mason denied plaintiff's request in his letter of September 18, 1992, citing a general policy against such testimony for reasons of impartiality and minimizing disruption. Further, Dr. Mason stated that no exception to this policy was warranted, because the "agency receives numerous requests for testimony in litigation and cannot accommodate all such requests and still conduct its business." Joint Statement ¶ 40.

The plaintiff demands relief on the basis that Dr. Mason lacked a rational basis to make this determination. More specifically, the plaintiff claims that Dr. Mason's denial violated HHS's own regulations, which state that an applicant for employee testimony must "state the nature of the requested testimony, why the information sought is unavailable by any other means, and the reasons why the testimony would be in the interests of [HHS]." 45 C.F.R. § 2.4(a). The plaintiff further alleges that Dr. Mason's stated grounds for his denial are unsubstantiated and insufficient.

■ The Court concludes that Dr. Mason acted rationally, considered all relevant factors, and did not exceed the scope of his authority. Unfortunately for the plaintiff, meeting the requirements of Section 2.4(a) does not automatically trigger the approval of the requested testimony, but merely indicates that an applicant has reached a minimal threshold for agency determination. As HHS regulations state:

No [HHS] employee may provide testimony … concerning information acquired in the course of performing official duties … unless authorized by the Agency head pur-

suant to this part based on a *determination by the Agency head,* after consultation with the Office of the General Counsel, *that compliance with the request would promote the objectives of the [HHS].* 45 C.F.R. § 2.3 (emphasis added). Dr. Mason duly consulted with the Office of the General Counsel, and he is well within his discretion to conclude that permitting Drs. Love and Crofford to testify would compromise the impartiality of HHS and disrupt the agency's official duties.

 None of plaintiff's attacks on Dr. Mason's grounds for denial hold water. First, the plaintiff claims that HHS's decision was based on legal error and should not be upheld, because Chief Counsel's letter was legally incorrect in stating that plaintiff's request "appears to be an attempt to circumvent the denial of information under the Freedom of Information Act and to obtain expert testimony." Riseberg Memo. The plaintiff contends that HHS improperly denied the request, because "an abuse of discretion may be found if ... the decision is based on an improper understanding of the law". *Animal Legal Defense Fund v. Yeutter,* 760 F.Supp. 923, 928 (D.D.C.1991). However, the fact that an extensive administrative record happens to include a questionable, or even erroneous, legal *speculation* does not signify that Dr. Mason relied on this fact to the point of legal error, nor does it show that his decision stemmed from an "improper understanding of the law."

 Second, the plaintiff asserts that HHS's concern over Dr. Love's testimony in FDA lawsuits is "spurious," because HHS has insufficiently explained this supposed conflict regarding impartiality. The Court dismisses this charge because this piece of information is not a dispositive factor, in that Dr. Mason denied the request for Dr. Crofford's testimony, about which no conflict with FDA litigation was alleged. Speculative misstatements of law in the administrative record are insufficient to establish a taint in the record, absent a showing of reliance by the decision-maker.

 Finally, the plaintiff challenges Dr. Mason's statement that "there are other ex- perts who could provide information related to EMS and L-tryptophan," because while this statement is true, it misses the point that Drs. Crofford and Love are uniquely qualified to evaluate the link between EMS and L-tryptophan. The Court rejects this argument because under § 2.3, Dr. Mason has a broader mandate to promote the objectives of the HHS. The information before him when he made the determination indicated that there was no iron-clad safeguard to prevent further requests for testimony if he granted the request; that other experts were available to provide relevant information regarding L-tryptophan and EMS; and that permitting his top researchers to be deposed would disrupt the advancement of public health and compromise at least the appearance of impartiality. Therefore, he acted rationally in denying the request.

*B. Dr. Chesemore had a rational basis in denying plaintiff's request to depose Drs. Douglas Archer and Samuel Page.*

The parties are in agreement regarding the essential facts surrounding the FDA's denial of plaintiff's request for deposition testimony from FDA Drs. Douglas Archer and Sam Page. Joint Statement ¶¶ 7–31. The requests arise from two sets of circumstances. An FDA–CDC scientific expert panel, including Drs. Archer and Page, visited Oita, Japan in May 1990 to investigate L-tryptophan manufacture. On May 30, 1990, one member sent a telex stating that the "companies [including SDK] ... provided good cooperation."

On July 18, 1991, Dr. Archer appeared before the House Committee on Government Operations, Subcommittee on Intergovernmental Relations and Human Resources to present on overview of the 1989 incident, FDA's regulation of L-tryptophan, its actions in response to the onset of EMS, and scientific research to date. Reading from a prepared statement, Dr. Archer testified that "it is not yet clear whether [EMS] is associated with a contaminant, L-tryptophan itself, or even due to individual abnormalities in L-tryptophan metabolism." Regarding pending litigation, he stated that FDA believed

that courts were likely to find that L-tryptophan was in fact Generally Recognized as Safe ("GRAS") before the 1989 incidences of EMS.

In a letter dated June 9, 1992, the plaintiff requested Commissioner David Kessler's permission to allow Drs. Archer and Page to testify in depositions for the pending MDL proceedings, pursuant to 21 C.F.R. § 20.1. More specifically, the plaintiff sought their testimony regarding Dr. Archer's statement to the Subcommittee and Dr. Page's telex, respectively. This letter stated that these doctors were the sole source of information contained in their statements, that direct examination would not go beyond the specifically cited areas of concern, and that the plaintiff

> will take all steps possible to assure that these witnesses are not subjected to repetitive discovery by cross noticing the depositions of Drs. Archer and Page in all cases that are not part of the MDL proceeding, and will videotape the depositions to avoid the need for the witnesses to appear at any trial.

The plaintiff also stated that allowing these doctors to testify would advance the public interest because the record to be built is of major importance, and the public has an interest in a clear and complete record.

Associate Commissioner for Regulatory Affairs Ronald G. Chesemore responded to plaintiff's requests in his letter dated July 10, 1992:

> FDA receives numerous requests for its employees to participate in litigation to which FDA is not a party. It is the policy of the Agency to decline to authorize our employees to testify in their official capacities unless their are *compelling circumstances.*
>
> Such circumstances include cases in which an FDA employee is the only source of the factual information requested, cases in which official records are not available to certify for admission in court, or cases in which there is an overriding public health interest important enough to justify interrupting the duties of personnel ...
>
> This policy had been established to protect the public health by ensuring that

FDA employees spend their time pursuing their official duties and not serving as witnesses in private lawsuits. Our policy is also intended to avoid creating the impression that FDA or one of its employees is taking a partisan position in litigation to which the Agency is not a party. Even when FDA determines that testimony will be in the public interest and would promote the statutory mission of the Agency, our regulations do not require the Commissioner to grant a request for testimony. Rather, the Commissioner is simply authorized to grant such a request as an exercise of his discretion.

> In this case, you have provided no convincing argument that the public interest would be served by Drs. Archer and Page taking government time to testify on behalf of the manufacturer of a product of uncertain safety. Accordingly, pursuant to 21 CFR 20.1, your request for their testimony is denied.

(emphasis added). The relevant regulations lay out FDA's policy regarding employee testimony:

> No officer or employee of the Food and Drug Administration or of any other office or establishment in the Department of Health and Human Services, except as authorized by the Commissioner of Food and Drugs pursuant to this section or in the discharge of his official duties under the laws administered by the Food and Drug Administration, shall give any testimony before any tribunal pertaining to any function of the Food and Drug Administration or with respect to any information acquired in the discharge of his official duties.

21 C.F.R. § 20.1(a).

▉ Associate Commissioner Chesemore's determination was neither arbitrary, capricious, an abuse of discretion, nor contrary to law. On the record before him, he had a rational basis to conclude that the circumstances were insufficiently "compelling" to interrupt his employees from their important work. Dr. Archer had informed Mr. Chesemore's assistant, Irene Kelly, that experts outside FDA could testify for SDK

and SDA, and that he lacked personal knowledge of the matters to which he testified before Congress.

Moreover, Associate Commissioner Chesemore was well within his discretion to determine that plaintiff's arguments did not overcome the regulatory presumption against employee testimony in private litigation. The plaintiff's disagreement with Mr. Chesemore's evaluation of the circumstances is insufficient to overturn an agency's determination. *See Stone v. Heckler,* 715 F.2d 179, 182 (5th Cir.1983) (citing *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)) (stating that courts should defer to an agency's construction of an administrative regulation). The plaintiff argues that the FDA reflexively dismissed plaintiff's request and that Dr. Archer has unique testimony relevant to the plaintiff's litigation, but the regulations recognize and encourage the ability of FDA policymakers to take a broad view and act for the public interest. Mr. Chesemore acted rationally in reasoning that public health would be furthered more by allowing his researchers to do their work than by disrupting their research so they could allow a private litigant to prepare a defense that, according to the documents before Mr. Chesemore, could be prepared through other deponents. *See Moore v. Armour Pharmaceutical Co.,* 129 F.R.D. 551, 555 (N.D.Ga.1990), *aff'd,* 927 F.2d 1194 (11th Cir.1991) ("[Plaintiff's] interest in getting the deposition simply cannot compare to the government's interest in maximizing the use of its limited resources in dealing with a national health crisis").

■ Similarly, Dr. Chesemore had a rational basis to conclude that there were no "compelling circumstances" that would mandate granting plaintiff's request to depose Dr. Page. The plaintiff argues that Dr. Page's testimony regarding the cooperation of its clients would advance a substantial public interest, "namely, the judicial system's access to testimony from governmental officials." Plaintiff's Motion for Summary Judgment, pp. 40–41. Even if Dr. Page is the

author of the telex,[12] Mr. Chesemore was not acting arbitrarily or capriciously in determining that the public's interest in access to testimony would be outweighed by (1) the inference of impartiality that would arise from allowing Dr. Page to testify for SDK and SDA, combined with (2) the interference of lengthy or numerous depositions on FDA's research and regulatory functions.

Even taken at face value, plaintiff's own statement in its request that the admissibility at trial of Dr. Archer's congressional testimony and the FDA/CDC telex was merely "uncertain," and not necessarily excluded, is consistent with Mr. Chesemore's determination that no "compelling circumstances" existed. Likewise, the agencies may rationally have doubted plaintiff's statement that it will take "all steps possible" to prevent repetitive discovery of the doctors, because the plaintiff failed to address fully how to handle the cross-examination of 700 plaintiffs in the MDL proceedings, as well as the effect of the proposed deposition on the 300 state court cases.

### III. DUE PROCESS

■ The constitutional claim at issue is whether defendants' withholding documentary and testimonial evidence violates the Due Process Clause of the Fifth Amendment to the United States Constitution. The plaintiff claims that this withholding prevents its clients from mounting an adequate defense in the various L-tryptophan litigations. It cites *American Sur. Co. v. Baldwin,* 287 U.S. 156, 168, 53 S.Ct. 98, 102, 77 L.Ed. 231 (1932), for the well-established proposition that "[d]ue process requires that there be an opportunity to present every available defense." More specifically, the plaintiff contends that denial of access to the requested records and testimony contravenes the Due Process Clause, because the withheld evidence relate to "critical and decisive allegations" going to the heart of plaintiff's claim. *See Complaint of Bankers Trust Co.,* 752 F.2d 874, 890 (3rd Cir.1984); *McClelland v. Andrus,* 606 F.2d 1278, 1286 (D.C.Cir.1979).

---

**12.** Defendants dispute the authorship of the telex from Japan. They concede only what the document states, that the "telegram has been cleared by the fda/cdc team leaders, dr. sam page (fda) and dr. eric sampson (cdc)."

■ The Court does not agree. Unlike cases such as *American Sur. Co.*, in which a party did not have an opportunity to enter any defense on a bond issue before the entry of judgment, the plaintiff here is attempting to assert a right to specific documents or testimony as part of a broader defense. This right to present specific evidence is not constitutionally protected. *See, e.g., Premex, Inc. v. Commodity Futures Trading Comm'n*, 785 F.2d 1403, 1408 (9th Cir.1986). The plaintiff will have a full opportunity to defend SDK and SDA in the pending liability litigation, despite the lack of documents withheld under FOIA and testimony withheld under the APA.[13] FOIA, HHS regulations, the Federal Rules of Procedure and the Federal Rules of Evidence will all limit the information that the plaintiff can access before trial, as well as the evidence it can admit at trial. Were this Court to accept plaintiff's Due Process argument, it would essentially invalidate these laws—and the plaintiff has not shown that any of them violate the Constitution.

### CONCLUSION

Seeking evidentiary support for the product liability defense of its client in litigation throughout the country, the plaintiff challenges the government's denial of its requests for records and testimony. Apart from an electronic version of the Swygert database, the plaintiff is not entitled to any additional information from the government because the defendants have complied with their duty. Similarly, plaintiff may not take the testimony of Drs. Love, Crofford, Page, or Archer, because the defendants had a rational basis to deny the plaintiff's request to depose them. The defendants' response to these requests do not prevent plaintiff's clients from presenting an adequate defense in lawsuits brought against them, in accordance with the Due Process Clause of the Fifth Amendment. The Court shall enter an Order of even date herewith in accordance with this Memorandum Opinion.

13. Plaintiff did receive a staggering amount of information as a result of its requests (over 35,-000 pages of records), has engaged other experts

### ORDER

The parties in the above-captioned case have resolved many of the issues originally raised by the plaintiff in its Complaint. After reviewing the *Vaughn* Index filed by the FDA, the plaintiff dismissed its FOIA claims against FDA contained in Count III of the Complaint. Subsequently, following publication of *Pathological and Immunological Effects of Ingesting L–Tryptophan and 1,1′–Ethylidenebis (L–Tryptophan) in Lewis Rats*, 91 J. of Clinical Investigation 804 (1993) ("Lewis Rat II Study"), NIH voluntarily released to plaintiff the underlying data for the Lewis Rat II Study which had been withheld, and plaintiff dismissed its FOIA claims against NIH in Count II of its Complaint. Since the recent publication of *Tryptophan Contaminants Associated with Eosinophilia–Myalgia Syndrome*, 138 American J. Epidemiology 154 ("Philen Study"), the CDC is processing the underlying data for the Philen Study, except Dr. Philen's computer software programs and a draft of the manuscript of the article, and will release to plaintiff within the next six weeks records responsive to plaintiff's FOIA request to the CDC for records pertaining to the parties' cross motions for summary judgment which address plaintiff's remaining FOIA claims against the CDC (Complaint, Counts I and IV), plaintiff's request for review of the FDA's and NIH's denials of its requests for testimony (*Id.*, Counts V and VI) and plaintiff's Fifth Amendment due process claim (*Id.*, Count VII).

Upon consideration of extensive written record before this Court, including defendants' *Vaughn* Index and the Administrative Record submitted by the defendants in conjunction with plaintiff's APA claims, the arguments presented by counsel at hearings before the Court on May 25, 1993, and October 8, 1993 and the entire record herein, the applicable law, for the reasons articulated in this Court's Memorandum Opinion of even date herewith, and given the absence of a genuine issue of material fact, it is, by the Court, this 26th day of November, 1993,

to testify in its litigation, and its clients do not lack the resources to put forward a comprehensive defense.

ORDERED that upon the Court's finding that in response to plaintiff's January 31, 1991, FOIA request for records on the "Kamb" and "Miller" study, defendant CDC conducted reasonable searches for responsive records and released these records and plaintiff did not file administrative appeals contesting these searches or releases, defendants' motion for summary judgment on the Kamb and Miller studies (Complaint, Count I) shall be and hereby is GRANTED; and it is

FURTHER ORDERED that upon the Court's finding that plaintiff exhausted its administrative remedies with respect to its January 22, 1992, FOIA request for records pertaining to the Swygert study, including the Swygert database, plaintiff's motion for summary judgment shall be and hereby is GRANTED, and defendant CDC shall provide plaintiff with a copy of the Swygert database in electronic format (*Id.*, Count I); and it is

FURTHER ORDERED that upon the Court's finding that Dr. Philen's computer programs are agency records for the purposes of FOIA but that the CDC properly withheld these programs and the draft manuscript of Dr. Philen's study under the deliberative process privilege of Exemption 5, defendants' motion for summary judgment on the computer programs and the draft manuscript for the Philen Study (*Id.*, Count I) shall be and hereby is GRANTED; and it is

FURTHER ORDERED that upon the Court's finding that plaintiff failed to exhaust its administrative remedies for its claims as to the unintelligibility of the CDC's responses to its May 3, 1990, January 31, 1991, and April 19, 1991, FOIA requests, defendants' motion for summary judgment on Count IV of the Complaint shall be and hereby is GRANTED; and it is

FURTHER ORDERED that upon the Court's finding that Ronald Chesemore, Associate Commissioner for Regulatory Affairs, FDA, engaged in reasoned decisionmaking in denying, pursuant to 21 C.F.R. § 20.1, plaintiff's request for Dr. Douglas Archer and Dr. Samuel Page to testify at depositions in the multi-district L-tryptophan litigation, and

that his denial was neither arbitrary, capricious, an abuse of discretion nor not otherwise in accordance with law, defendants' motion for summary judgment on Count V of the Complaint shall be and hereby is GRANTED; and it is

FURTHER ORDERED that upon the Court's finding that Dr. James Mason, Assistant Secretary for Health, HHS, engaged in reasoned decisionmaking in denying, pursuant to 45 C.F.R. Part 2, plaintiff's request for Dr. Lori Love and Dr. Leslie Crofford to testify at depositions in the multi-district L-tryptophan litigation, and that his denial was neither arbitrary, capricious, an abuse of discretion nor not otherwise in accordance with law, defendants' motion for summary judgment on Count VI of the Complaint shall be and hereby is GRANTED; and it is

FURTHER ORDERED that defendants' motion for summary judgment on plaintiff's constitutional due process claim in Count VII shall be and hereby is GRANTED;

FURTHER ORDERED that defendant CDC, which is currently processing the underlying data for the Philen Study, with the exception of Dr. Philen's computer software programs and a draft of the manuscript of the article, shall release to the plaintiff all records responsive to plaintiff's FOIA request to CDC for records pertaining to the Philen Study on or before 4:00 p.m. on December 17, 1993; and it is

FURTHER ORDERED that the above-captioned case shall be, and hereby is, DISMISSED from the dockets of this Court; and it is

FURTHER ORDERED that all other outstanding motions are hereby rendered and declared MOOT.